PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

ABDILLAH S. ABDI,
*Defendant-Appellant.*

No. 02-4759

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

ABDIRAHMAN SHEIK-ALI ISSE,
*Defendant-Appellant.*

No. 02-4774

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

v.

ABDIRAHMAN SHEIK-ALI ISSE,
*Defendant-Appellee.*

No. 02-4814

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

v.

ABDILLAH S. ABDI,
*Defendant-Appellee.*

No. 02-4815

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Senior District Judge.
(CR-02-142-A)

Argued: May 9, 2003

Decided: September 3, 2003

Before NIEMEYER and MOTZ, Circuit Judges, and
Joseph R. GOODWIN, United States District Judge for the
Southern District of West Virginia, sitting by designation.

---

Affirmed in part, vacated in part, and remanded by published opinion.
Judge Niemeyer wrote the opinion, in which Judge Goodwin joined.
Judge Motz wrote a separate opinion concurring in Part III and in the
judgment.

---

**COUNSEL**

**ARGUED:** Christopher Dean Latsios, Fairfax, Virginia, for Appellant Abdi; Jonathan Shapiro, LAW OFFICES OF JONATHAN SHAPIRO, P.C., Alexandria, Virginia, for Appellant Isse. Gordon Dean Kromberg, Assistant United States Attorney, Alexandria, Virginia, for Appellee. **ON BRIEF:** Paul J. McNulty, United States Attorney, Neil Hammerstrom, Jr., Assistant United States Attorney, Alexandria, Virginia, for Appellee.

---

**OPINION**

NIEMEYER, Circuit Judge:

Abdirahman Isse and Abdillah Abdi pleaded guilty to conspiracy to structure financial transactions to evade reporting requirements, in violation of 31 U.S.C. § 5324. The total amount of money structured

during the course of the conspiracy was over $4.2 million, all of which was attributable to Isse and approximately $3.3 million of which was attributable to Abdi, who joined later. The district court sentenced Isse to 18 months' imprisonment and Abdi to 5 months' imprisonment and 5 months' home confinement.

On appeal, the defendants challenge their sentences, contending that the district court did not properly apply U.S.S.G. § 2S1.3(b)(2) so as to reduce their sentencing levels to reflect that they had no knowledge of whether the funds that they structured were the proceeds of unlawful activities or were to be used for unlawful purposes. The government cross-appealed, contending that the district court erred in failing to take into account all of the funds structured, rather than only 3% of that amount.

For the reasons that follow, we affirm on the defendants' appeals and we reverse on the government's cross-appeals, remanding these cases for resentencing.

I

Between 1997 and November 7, 2001, Isse operated a money-transmitting service, which Abdi, Isse's nephew, joined in 2000. Isse initially operated the service from his home in Alexandria, Virginia, but later, doing business as Rage Associates, conducted the service as an agent of the Al-Barakat network, an international money-transmitting exchange headquartered in the United Arab Emirates, using Al-Barakat's premises in Alexandria. During the conspiracy, the defendants' business received a total of $4,244,499 in cash from individuals wishing to transmit money to Somalia, Ethiopia, Kenya, and Sudan. The defendants did not ask their customers about the sources of the cash that the defendants received for transmission through Al-Barakat nor the uses for which the money was to be transmitted, although some customers told the defendants that they were sending money to relatives.

When the defendants received funds from customers, they deposited them in multiple accounts at various branches of banks in Northern Virginia. To avoid the $10,000 threshold for reporting transactions, they always deposited the amounts with the banks in

sums of less than $10,000 — usually between $9,000 and $9,990 —
and on some days, they made several such deposits. Because the
deposits were in cash amounts less than $10,000, they did not prompt
the banks to file currency transaction reports required under 31 U.S.C.
§ 5313 and 31 C.F.R. § 103.22(b)(1) for amounts more than $10,000.
The defendants then transmitted the funds from the bank accounts to
the Al-Barakat headquarters in the United Arab Emirates for further
transfer to agents in Somalia, Ethiopia, Kenya, and Sudan. As com-
pensation for each transmission of funds for a customer, the defen-
dants generally retained 1% of the deposit and remitted another 3%
to Al-Barakat, of which Al-Barakat kept two-thirds (2% of the total
deposit) and remitted the remaining one-third (1% of the total deposit)
to the agent in the receiving country.

In conducting their business, the defendants failed to obtain a
money-transmittal license as required by Virginia and federal law.

On November 7, 2001, the Department of the Treasury froze the
assets of the Al-Barakat network, including certain bank accounts of
Rage Associates, on the ground that the owner of the network directed
profits of the business to Al-Qaeda, a terrorist organization. On the
same day, law enforcement agents executed search warrants on the
offices of various agents of the Al-Barakat network, including the
defendants' business in Alexandria. On the premises of the defen-
dants' business, officers found $29,422 in cash. The defendants were
indicted for numerous structuring offenses, and they pleaded guilty to
the one conspiracy count.

At sentencing, the defendants testified that they knew many of their
customers and kept records of the transactions they made, but they did
not know from where the customers derived the money and they did
not know for what the money was to be used once it was transmitted
overseas. The government presented media reports documenting
food-stamp fraud and the collection of funds by Somali refugees to
transmit large amounts of money to Somalia for purposes other than
simply supporting the contributors' families.

After the district court sentenced the defendants, they filed this
appeal challenging the district court's determination that they were
ineligible for reduction of their base offense level to level 6, pursuant

to U.S.S.G. § 2S1.3(b)(2) — a reduction that would have lowered their sentences. The government cross-appealed, challenging the value of funds used by the district court to calculate the defendants' base offense level under U.S.S.G. § 2S1.3(a).

II

The defendants contend that the district court interpreted U.S.S.G. § 2S1.3(b)(2) — referred to as a "safe harbor" provision entitling an eligible defendant to reduction of the sentencing level — as a "strict liability" provision that denied them the reduction regardless of their state of knowledge. They contend that they did not and could not know whether the monies they structured were the proceeds of illegal activities or were to be used for illegal purposes and that the district court erred in not applying the generally applicable provisions of U.S.S.G. § 1B1.3(a), which limits or extends — depending on one's circumstances — a conspirator's sentencing liability to "reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." Arguing that the knowledge of any illegal activities of their customers was not foreseeable, they state that such facts "were unknown to the appellants and fall outside the scope of the appellants' relevant conduct. They are not to be held accountable for it under the guideline principles of relevant conduct."

We find these contentions to be without merit. The defendants' argument fails to account for the plain meaning of U.S.S.G. § 2S1.3(b)(2) and the burden that the defendants must carry in demonstrating that they are entitled to the benefit of the reduction.

Section 2S1.3 of the Sentencing Guidelines directs a sentencing court to assign to the defendant a base level of "6 plus the number of offense levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the funds." U.S.S.G. § 2S1.3(a) (2001). It directs a court to *increase* the base offense level by two levels "[i]f the defendant knew or believed that the funds were proceeds of unlawful activity, or were intended to promote unlawful activity." *Id.* § 2S1.3(b)(1). And, in what has been termed its "safe harbor" provision, the guideline directs a court to *decrease* the offense level to level 6 if four conditions are satisfied:

> (A)   subsection (b)(1) does not apply [that defendants did not know or believe that the funds were the proceeds of unlawful activity or were intended to promote unlawful activity];
>
> (B)   the defendant did not act with reckless disregard of the source of the funds;
>
> (C)   the funds were the proceeds of lawful activity; and
>
> (D)   the funds were to be used for a lawful purpose.

*Id.* § 2S1.3(b)(2). Because the government concedes that (A) and (B) are satisfied in this case, this appeal involves only the final two conditions, (C) and (D).

The government, of course, bears the burden of demonstrating the requirements to *increase* the base offense level under § 2S1.3(b)(1). And because any *reduction* in a sentencing level under U.S.S.G. § 2S1.3(b)(2) can be given only upon demonstration of conditions (A)-(D), it follows that the defendant, not the government, has this burden of showing entitlement to any *reduction*. *See United States v. Solomon*, 274 F.3d 825, 828 n.2 (4th Cir. 2001) (noting that "every circuit to consider [who bears the burden of proof] has assigned to the defendant the burden of proving entitlement to a sentencing reduction"). Absent the government's demonstration that the defendants knew the activity or purpose was *unlawful* or the defendants' demonstration that the activity and purpose were *lawful*, the guideline defaults to an offense level of 6 plus the number of offense levels determined by the value of the funds involved. It is thus apparent that in order to benefit from the safe harbor provision, the defendants must carry the burden of showing that the funds were derived from lawful activity and were to be used for lawful purposes.

In this case, complicated by the nature of the business in which the defendants were involved — handling the funds of numerous customers — the defendants failed to demonstrate that the proceeds that they structured were from "lawful activity" and that the monies they transmitted to the Al-Barakat network were to be used for "a lawful pur-

pose." Accordingly, the defendants were unable to meet their burden of satisfying the conditions for the safe harbor provision to obtain a reduction of their sentence offense level. Their argument that their conduct can only be measured by "reasonably foreseeable acts . . . in furtherance of the jointly undertaken criminal activity," as provided under § 1B1.3(a), fails to recognize that § 1B1.3(a) defines the factors relevant to determine generally the scope for which a defendant is to be sentenced. The factors set forth in § 1B1.3(a) were not intended to overrule specific factors made controlling by an applicable guideline. *See* U.S.S.G. § 1B1.3(a) (2001) (stating that principles of relevant conduct apply "[u]nless otherwise specified"). And where a guideline sets forth conditions under which the defendant may prove entitlement to a *reduction* in the otherwise applicable sentencing range, the defendant is not denied that opportunity by the general provisions of § 1B1.3(a). Under the guideline applicable here, § 2S1.3(b)(2), a defendant will benefit from a reduction in his sentencing level if he can *demonstrate affirmatively* that the structured monies were the proceeds of lawful activity and were to be used for lawful purposes. Those conditions of § 2S1.3(b)(2) are quite distinct from the factors relevant to § 1B1.3(a). As explicitly directed by § 1B1.3(a), we must be guided by the specific language of the applicable guideline, § 2S1.3(b)(2), when determining whether the defendants are entitled to the reduction. When so guided, we do not read § 2S1.3(b)(2)(D) as limited to the defendant's conduct and thus disagree with the Second Circuit's statement in *United States v. Bove*, 155 F.3d 44, 48 (2d Cir. 1998), that the requirement of a "lawful purpose" "speaks in terms of the purpose for which the structured funds were used by the defendant."

To this, the defendants argue that the transmittal business in which they were engaged was a lawful activity and that their customers' transmissions of funds to the defendants for further transmission to the Al-Barakat headquarters in the United Arab Emirates fulfills their burden of demonstrating that the purposes were lawful.\* This argument, however, relies on too narrow a reading of the guideline. A

---

\*In making this argument, the defendants overlook the fact that their money-transmittal business failed to have a license as required by Virginia and federal law. To address their argument, however, we can assume that the defendants could have obtained the requisite license.

reading of § 2S1.3(b)(2) that defines "proceeds" as the funds the *defendants* themselves received and transmitted in their wire-transmittal business disassociates that term from common sense. The funds held by the defendants were their customers' funds and there-fore were not the proceeds of the wire-transmittal business, but rather were the proceeds of some other transactions by which their custom-ers obtained the monies. And merely transferring proceeds of an unlawful origin does not wash them of their taint. It is thus the defen-dant's lack of evidence regarding the lawfulness of those proceeds that precludes their satisfaction of condition (C).

The same may be said for the defendants' argument that the funds were used for lawful purposes in transmitting them to the Al Barakat network. Again Al-Barakat was not being paid those funds for some-thing that it rendered and that could provide a measurement of the lawfulness of the activity. Rather Al-Barakat handled the customers' funds and transmitted them to some other recipient source, and the legality of any given recipient's actual or intended use of the funds was not demonstrated one way or the other in this case. Indeed, if any inference were to be drawn from the facts, it would cut against the defendants' argument. In pleading guilty, the defendants agreed to facts that "the Department of Treasury's Office of Foreign Assets Control (OFAC) froze the assets of the Barakat Network and its agents across the United States, on the grounds that the owner of the Barakat Network was directing some of the profits of the business to Al-Qaida," a terrorist organization. In addition, the probation officer, in responding to the defendants' objections to the presentence reports, stated that it was "well known in the Somalian community that [Al-Barakat] was laundering funds for . . . Al-Q[ae]da" and that "the funds that were retained by Al-Barakat were not used for a lawful purpose, they were given to . . . Al-Q[ae]da." Although these statements were not offered to prove that the defendants knew of the possible illegal purposes of the funds, they nonetheless indicate that the defendants would probably be unable to satisfy their burden, if they had undertaken to do so, to demonstrate that the proceeds were to be used for a lawful purpose pursuant to condition (D).

In short, we find no error in the district court's conclusion that the defendants were not entitled to the sentencing reduction offered by the safe harbor provision of U.S.S.G. § 2S1.3(b)(2).

## III

On its cross-appeal, the government contends that the district court erred in determining the defendants' base offense level under U.S.S.G. § 2S1.3(a) by failing to take into account the entire amount of funds the defendants structured — over $4.2 million for Isse and over $3.3 million for Abdi (reflecting his later participation in the conspiracy). The district court found that to apply these amounts would be "unjust" and contrary to sentencing guidelines on convictions for money laundering and tax law violations. Accordingly, it applied § 2S1.3(a) by using, for "value of the funds," $127,334.97 for Isse and $100,588.23 for Abdi, representing the 3% remittal of the total structured funds because the 3% remittal to Al-Barakat "went to an unlawful purpose (Al-Barakat's support of Al Q[ae]da)."

In addition to relying on the district court's reasoning, the defendants contend alternatively that the "value of the funds" should be limited to "that amount of money without which there would be no structuring violation." They explain: "In the present case, that would include only that money which exceeded $10,000 which the defendants broke down into multiple deposits on a single day."

We reject the interpretations offered by both the district court and the defendants. Based on a straightforward reading of § 2S1.3(a) and the accompanying application note, we agree with the government's position. The "value of the funds" is the entire amount of the funds that the defendant structured because that is the amount "involved in the structuring or reporting conduct." *See* U.S.S.G. § 2S1.3 cmt. n.1. The value is not limited to the portion of the funds above $10,000 on any given day, and the provision grants no discretion to the court to reduce the amount.

Accordingly, we conclude that the district court erred in its interpretation of § 2S1.3(a) and its calculation of the value of the structured funds involved for sentencing purposes. We vacate the defendants' sentences and remand for resentencing to apply § 2S1.3(a) by using $4,244,499 as the amount involved when sentencing Isse and $3,352,941 when sentencing Abdi.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED*

DIANA GRIBBON MOTZ, Circuit Judge, concurring in part III and in the judgment:

The defendants' wire transmittal business did not constitute a "lawful activity" under U.S.S.G. § 2S1.3(b)(2) because they failed to obtain the licenses required by Virginia and federal law. For this reason, I concur in the judgment affirming the district court's conclusion that the defendants were not entitled to the sentencing reduction offered by the safe harbor provision of U.S.S.G. § 2S1.3(b)(2). I do not join the majority's rationale, however, because if the defendants had obtained the requisite licenses, then I believe that they would have qualified for U.S.S.G. § 2S1.3(b)'s safe harbor reduction.

Section 2S1.3(b) provides that a defendant convicted of structuring can obtain a decrease in his offense level to level 6 if:

> (A)  subsection (b)(1) does not apply [that defendants did not know or believe that the funds were the proceeds of unlawful activity or were intended to promote unlawful activity];
>
> (B)  the defendant did not act with reckless disregard of the source of the funds;
>
> (C)  the funds were the proceeds of lawful activity; and
>
> (D)  the funds were to be used for a lawful purpose.

*Id.* § 2S1.3(b)(2). Because the Government concedes that (A) and (B) are satisfied in this case, this appeal involves only the final two conditions, (C) and (D).

The defendants argue that they are entitled to the benefit of the safe harbor reduction because the only conduct relevant under the Guidelines in determining whether the structured funds were the "proceeds of lawful activity" or "used for a lawful purpose" is the financial structuring by the defendants themselves, not the conduct of the people who gave the defendants money to be wired or the recipients of the wire transfers. Thus, the defendants maintain that they proved by

a preponderance of the evidence that they received the structured funds as part of a "lawful activity," *i.e.*, operating a wire transfer business (if they had obtained the required licenses), and used the funds for a "lawful purpose," *i.e.*, wire transferring. For these reasons they assert that they satisfied conditions § 2S1.3(b)(2)(C) and (D) and so were entitled to the safe harbor reduction.

The Government, and now the majority, contend that this is not so because the defendants must prove not only that their own activity and purposes were lawful, but also that those from whom they received funds engaged in a lawful activity and those to whom they sent the funds used them for a lawful purpose. It is true, of course, that a co-conspirator is responsible for, and so may be sentenced on the basis of, "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). But "conduct of others that was not in furtherance of the criminal activity jointly undertaken by the defendant[s], or was not reasonably foreseeable in connection with that criminal activity, is not relevant conduct[.]" *See* U.S.S.G. § 1B1.3 cmt. n.2. Since there is no suggestion here that the defendants jointly undertook any criminal activity beyond illegal structuring, the manner in which the defendants' clients obtained the structured funds and the manner in which recipients of the funds used the money does not constitute relevant conduct attributable to defendants for sentencing purposes.

Although unacknowledged by the majority, the only circuit to consider the question has interpreted the safe harbor provision as I do. *See United States v. Bove*, 155 F.3d 44 (2d Cir. 1998). There, as here, the district court declined to apply the safe harbor provision. The defendant had used illegally structured money to buy property from a seller who then failed to report all the proceeds from the sale. Relying on that failure, the district court held that the buyer was not entitled to the safe harbor reduction, reasoning that the structured funds were ultimately used by the seller of property, which had been legitimately purchased (albeit with structured funds), to evade taxes and therefore not "used for a lawful purpose." The Second Circuit reversed, holding that "§ 2S1.3(b)(2)(D) speaks in terms of the purpose for which the structured funds were used by the defendant . . . . [H]ere, the funds were used for [the defendant's] wholly lawful purpose of purchasing real estate." *Id.* at 48-49. For this reason, the Sec-

ond Circuit held that the defendant was indeed entitled to the safe
harbor reduction.

I find the Second Circuit's rationale and holding compelling and
would not create a circuit conflict. But, as noted above, since the
defendants' wire transmittal business in this case did not in fact con-
stitute a lawful activity because they failed to obtain the required
licenses, I concur in the judgment affirming the district court's denial
of the safe harbor reduction.