# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 4, 2008 Decided January 23, 2009

No. 07-3021

UNITED STATES OF AMERICA,
APPELLEE

v.

KESETBRHAN M. KELETA,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 05cr00371-01)

*Tony Axam Jr.*, Assistant Federal Public Defender, argued the cause for appellant. With him on the briefs was *A. J. Kramer*, Federal Public Defender.

*Leslie Ann Gerardo*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *Roy W. McLeese III*, *Florence Pan*, and *Jay I. Bratt*, Assistant U.S. Attorneys.

Before: SENTELLE, *Chief Judge*, and HENDERSON, *Circuit Judge*, and WILLIAMS, *Senior Circuit Judge*

Opinion for the Court filed by *Chief Judge* SENTELLE.

Dissenting opinion filed by *Senior Judge* WILLIAMS.

SENTELLE, *Chief Judge*: Kesetbrhan M. Keleta was convicted of operating a money-transmitting business without a license, in violation of 18 U.S.C. § 1960. He was sentenced pursuant to United States Sentencing Guidelines §§ 2S1.3 and 2B1.1. At sentencing, the district court denied reduction of Keleta's sentence in accordance with § 2S1.3(b)(3), a "safe harbor" provision permitting a sentence reduction when specified conditions are met. On appeal he argues that his sentence pursuant to Sentencing Guidelines §§ 2S1.3 and 2B1.1 was unreasonable, that the district court erred in denying him safe harbor, and that his counsel was ineffective for failing to object to alleged shifts in burdens of proof and for failing to present safe harbor evidence.

Because we conclude that Keleta's sentence was reasonable, that there was no error in denying him safe harbor, and that his attorney was not ineffective, we affirm the judgment of the district court.

**Background**

The Embassy of Eritrea established a money-transmitting business in Washington, D.C., in the mid-1990s to enable Eritrean citizens living in the United States to send money back to Eritrea. In August 2000, the business was taken over by a company called "Himbol Financial Services." Himbol enabled customers to send money not only to Eritrea but also to Eritrean nationals in other parts of the world. In 2001 Himbol hired the appellant, Kesetbrhan M. Keleta, to manage the business. One of his duties was to obtain a license for the money-transfer business. He filed a license application, which was pending between May 2001 and February 2002. Keleta left Himbol's employ at the end of 2002. In October 2005, he was charged

with two counts of violating 18 U.S.C. § 1960, which prohibits conducting, controlling, managing, supervising, or directing an unlicensed money-transmitting business. The first count related to conduct occurring between March 2001 and October 25, 2001. Reflecting amendment of the statute on October 26, 2001, the second count related to conduct occurring between October 26, 2001, and September 2002. Following a jury trial, Keleta was convicted on both counts.

The district court sentenced Keleta pursuant to § 2S1.3 (a)(2) of the United States Sentencing Guidelines ("USSG" or "Guidelines"). That section provides for a base offense level of 6 plus additional levels "corresponding to the value of the funds." Those additional levels are to be determined using the table in § 2B1.1 of the Guidelines, with increased levels depending upon the "loss" incurred. The government offered evidence that, during the time of alleged illegal conduct, Keleta had sent or authorized over $10 million in wire transfers. This amount under § 2B1.1 resulted in an enhancement of 20 levels, bringing Keleta's base offense level to 26. Keleta argued to the district court that there was no basis for using the table in § 2B1.1 because there was no "loss" in his case. The district court disagreed, stating that loss to a victim was not an issue in punishing violations of 18 U.S.C. § 1960, which were "more akin to money laundering." The district court noted that the Guidelines range at this point was 63 to 78 months.

The court also considered whether USSG § 2S1.3 (b)(3), the so-called "safe harbor" provision, applied. Under that provision, if the defendant did not act with reckless disregard of the source of the funds, the funds were the proceeds of lawful activity, and the funds were to be used for a lawful purpose, then the base offense level was to be decreased back to 6. The court found, however, that Keleta did not meet any of these criteria and therefore denied him a sentence reduction under the "safe

harbor" provision.

The court gave Keleta a 3-level reduction for acceptance of responsibility as well as an additional 2-level reduction for mitigating circumstances, including Keleta's belief that he would receive some protection from the Eritrean Embassy for his involvement with Himbol, as well as Keleta's belief that he thought he was helping his country and those who lived there. His base offense level was therefore 21, with a corresponding sentencing range of 37 to 46 months. The court then subtracted six months, for Keleta's status as a deportable alien, from the bottom of the range. His final sentence was therefore 31 months.

## Discussion

Keleta now appeals his sentence, arguing that it was unreasonable, that the district court improperly denied him the benefit of the safe harbor provision, and that his lawyer at sentencing was ineffective.

### Unreasonable sentence

Keleta was convicted of violating 18 U.S.C. § 1960(b)(1)(A) and (B). In determining Keleta's base offense level for sentencing, the district court applied USSG § 2S1.3(a)(2). That section calls for a base offense level of "6 plus the number of offense levels from the table in § 2B1.1 . . . corresponding to the value of the funds." Because there was testimony presented at trial that the value of the funds transferred by Keleta was approximately $10 million, Keleta's offense level under the table in § 2B1.1(b)(1) was increased by 20 points. USSG § 2B1.1(b)(1)(K). Keleta objected to any increase under § 2B1.1(b)(1), noting that that section specifically refers to increases in the offense level for specific

amounts of "loss" and there was no loss involved in the funds he had transferred. At the sentencing colloquy the district court rejected Keleta's argument, stating:

> Loss to a victim is not a requirement. Loss is clearly not an issue in these 1960 transaction[s]. They are more akin to money laundering. And the table in [§]2B1 is used really only to indicate the levels to be increased by the funds.

Keleta's primary focus on this appeal is the district court's "akin to money laundering" statement. That statement shows, he argues, that the court's rationale for using the value of the transferred funds to increase his sentence was to equate his crime to money laundering. But, he asserts, money laundering was not a part of the nature and circumstances of his crime, contending that money laundering is "a specific intent crime" and the subsections of 18 U.S.C. § 1960 under which he was convicted have a much narrower focus than general money laundering statutes. He asserts that those subsections were enacted to punish businesses that fail to register, not to punish the actual transfer of money. He further asserts that in 2001 Congress amended 18 U.S.C. § 1960 to add a provision for punishing money laundering, subsection (b)(1)(C), and that this addition indicates that Congress did not intend to use the licensing and registration provisions of the subsections he was convicted under–i.e., (b)(1)(A) and (b)(1)(B)–to punish defendants for the value of the funds transferred.

Given his individual facts and circumstances, Keleta argues that his sentence was not reasonable. He notes that in *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court directed sentencing courts to consider the factors set forth in 18 U.S.C. § 3553(a) in addition to any applicable Guidelines, and that among those factors are the nature and circumstances of the

offense. Keleta claims that here the district court explicitly adopted the rationale that the nature and circumstances of his offense involved money laundering and the court thus incorporated the value of the funds from the table in § 2B1.1 in determining his base offense level. He asserts that the value of the funds he transferred had no relationship to the individual nature and circumstances of his crime of operating an unlicensed money-transmitting business. Consequently, he claims that any increase to his sentence based upon the value of the transferred funds was unreasonable.

Responding to Keleta's claim, the government contends that the district court in fact did not increase his sentence because of a presumption of money laundering. The government asserts that the district court's "akin to money laundering" remark was not a factual finding but rather was made in response to an argument raised by Keleta, and was only intended to explain why the table in § 2B1.1 is incorporated into § 2S1.3 when there is no loss to a victim. The government further argues that § 2S1.3 establishes a sentencing scheme for unlicensed money transmission which does not require proof that the monies involved in the offense be classified as laundered funds. The government finally contends that the district court did not assume that Keleta had engaged in money laundering, and that in fact the court discussed at sentencing the lack of evidence that Keleta was involved in funding terrorism and other illegal enterprises.

Regardless of the district court's use of the term "akin to money laundering," its calculation of Keleta's base offense level was correct. In *Gall v. United States*, 128 S.Ct. 586, 596 (2007), the Supreme Court explained that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." As the government notes, USSG § 2S1.3, under which Keleta was sentenced, prescribes the very

methodology employed here by the district court: the commentary to that section references its application to violations of 18 U.S.C. § 1960(b)(1)(A) and (B), under which Keleta was convicted. The base offense level is to be calculated under § 2S1.3(a)(2) by adding "the number of offense levels from the table in § 2B1.1 . . . corresponding to the value of the funds." In the Application Notes to § 2S1.3, "value of the funds" is defined as "the amount of the funds involved in the structuring or reporting conduct. The relevant statutes require monetary reporting without regard to whether the funds were lawfully or unlawfully obtained." In *U.S. v. Abdullahi*, 520 F.3d 890 (8th Cir. 2008), the defendant was also sentenced for, *inter alia*, operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(b)(1)(A) and (B). The Eighth Circuit recited the sentencing scheme established by § 2S1.3(a)(2), and then noted that the defendant's base offense level was increased, as here, by the amount of funds involved in the unlicensed money transmitting business. *Id.* at 896 n.7. We agree with the approach of the Eighth Circuit. The sentencing scheme established by § 2S1.3(a)(2) does not require proof that the monies involved in the offense were themselves the product of illegal activity, were being transmitted for illegal means, or could be classified as laundered funds. We conclude that the district court correctly applied the Guidelines. "[A] sentence within a properly calculated Guidelines range is entitled to a rebuttable presumption of reasonableness." *United States v. Dorcely*, 454 F.3d 366, 376 (D.C. Cir. 2006). Keleta has not met his burden of rebutting the presumption of reasonableness in the district court's sentence.

## Safe harbor provision

As noted above, during sentencing Keleta was sentenced pursuant to USSG § 2S1.3(a)(2), which provides for a base level of 6 plus the appropriate enhancement from the table in § 2B1.1.

Also provided for in § 2S1.3 is subsection (b)(3), the so-called "safe harbor" provision, which states the following:

> If (A) subsection (a)(2) applies and subsections (b)(1) and (b)(2) do not apply; (B) the defendant did not act with reckless disregard of the source of the funds; (C) the funds were the proceeds of lawful activity; and (D) the funds were to be used for a lawful purpose, decrease the offense level to level 6.

The safe harbor provision essentially permits the district court to disregard the value of the funds involved in the offense and return the offense level to 6 when specified circumstances exist. In order for Keleta to benefit from the safe harbor provision, he was required to prove that he did not act with reckless disregard of the source of the funds being transferred, that the funds were the proceeds of lawful activity, and that the funds were to be used for a lawful purpose. Keleta argues that the district court erred in denying him safe harbor when it found the safe harbor provision inapplicable because he failed to prove that he met the provision's requisites. In doing so Keleta claims that the court operated under a presumption that the funds he transferred were related to money laundering, and he claims that because neither the crime he was convicted of nor the trial evidence supported a presumption that the funds were related to an unlawful source, activity, or purpose, the burden was on the government at sentencing to prove criminal acts that would support this presumption. He consequently argues that the district court erred when it relieved the government of this burden and instead shifted it to him. We disagree.

As Keleta admits, under *United States v. Burke*, 888 F.2d 862, 869 n.10 (D.C. Cir. 1989), the government bears the burden of proof in seeking sentencing enhancements under the Guidelines, but the defendant bears the burden in seeking

sentencing reductions. The safe harbor provision of USSG § 2S1.3 provides a possible sentencing reduction, and therefore it is the defendant's burden to prove that he is entitled to that reduction. In *United States v. Abdi*, 342 F.3d 313 (4th Cir. 2003), the defendants also claimed that they were entitled to the benefit of the reduction of the safe harbor provision. The Fourth Circuit succinctly stated that "in order to benefit from the safe harbor provision, the defendants must carry the burden of showing that the funds were derived from lawful activity and were to be used for lawful purposes." *Id.* at 317. We agree. It was Keleta's burden to prove that he was entitled to the sentencing reduction of the safe harbor provision, and the district court did not err in failing to shift the burden to the government to prove otherwise.

Ineffective assistance of counsel

Keleta argues that his attorney's representation of him at sentencing was ineffective. Under *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), an attorney is ineffective if, first, his performance fell below an objective standard of reasonableness, and, second, the deficiencies in his representation were prejudicial to his defense. First, Keleta argues that his counsel was ineffective for failing to object to the shift in the burden of proof requiring him to disprove that he laundered money, and for failing to object when the burden of proof was shifted to him to prove that his behavior fell within the safe harbor. He claims that if his attorney had argued that these burdens of proof were improperly allocated, the government would have had to present evidence in support of the separate criminal acts implied by the Guidelines and the only appropriate outcome would have been for the court to impose a lower sentence. As we already discussed, the burden to prove his eligibility for the safe harbor was in fact Keleta's. Consequently, Keleta's attorney was not ineffective for failing

to make these objections.

Second, Keleta argues that his counsel was ineffective for failing to present evidence during sentencing to satisfy the safe harbor provision of § 2S1.3(b)(3). He claims that there was no strategic reason not to present such evidence, and that since he met all of the requirements of the safe harbor provision, he would have been given a shorter sentence had his attorney presented such evidence. In order to show that he has met the prejudice standard of *Strickland*, Keleta "must show that there is a reasonable probability that, but for counsel's unprofessional errors," his sentence would have been different. 466 U.S. at 694. Although Keleta did not raise the safe-harbor issue with the district court, the government presented it in its sentencing memorandum. The district court then addressed the issue during the sentencing colloquy, discussing whether Keleta met the criteria of § 2S1.3(b)(3). Of the four criteria listed, the court found that Keleta could not meet three of them. The court stated that Keleta acted with reckless disregard of the source of the funds, and that there was no way to determine whether the funds were the proceeds of lawful activity or were to be used for a lawful purpose, because Himbol did not have in place a control system to verify the nature or source of the transferred funds and there was no information on who received the funds or the purpose of the transfer.

Keleta argues, however, that the district court erred in finding that he did not meet the criteria because the court used the wrong standard in determining that he acted with reckless disregard of the funds, controls tracking the funds were in fact in place, the business was established by and operated through the Embassy of Eritrea, it operated openly, and the funds were meant to help people back in Eritrea. Because these specific claims raised by Keleta were not presented to the district court, we will review them only for plain error. Under that standard

the district court's error must be "obvious." *See United States v. Bolla*, 346 F.3d 1148, 1152-53 (D.C. Cir. 2003). After review of the district court's findings and consideration of Keleta's arguments, we do not find any obvious errors in the district court's determination that he failed to meet the criteria of § 2S1.3(b)(3).

We conclude that even if Keleta's attorney had presented evidence concerning the criteria of the safe harbor provision, there is no "reasonable probability" that the district court would have given Keleta a different sentence. On the record and argument before us, we cannot conclude that Keleta's counsel could have offered evidence to meet the criteria of the safe harbor provision so as to entitle Keleta to the reduction provided by that provision. He has shown us nothing to support a reasonable probability that the district court would have found controls establishing lawful origin of the funds, or that the purpose of aiding Eritrean citizens was ultimately for assisting lawful activities of those citizens, as opposed to unlawful ones. In short, there is no "reasonable probability" that a more thorough and aggressive counsel could have convinced the court to sentence any differently than it did. Keleta's attorney was therefore not ineffective for failing to present such evidence.

## Conclusion

The judgment of the district court is affirmed.

WILLIAMS, *Senior Circuit Judge*, dissenting: In reviewing sentences for reasonableness, one of our first tasks is to make sure the district court did not "improperly calculat[e] the Guidelines range." *Gall v. United States*, 128 S. Ct. 586, 597 (2007). Here the district court added 20 levels to Keleta's base offense level, bringing it to 26, in what seems to me a clear misapplication of the pertinent guideline, U.S. Sentencing Guidelines ("USSG") § 2S1.3(a)(2). Accordingly, I would reverse and remand for resentencing.

Section 2S1.3(a)(2) states that the base offense level for a variety of crimes, including the offenses of conviction here (18 U.S.C. § 1960), shall be "6 plus the number of offense levels from the table in § 2B1.1 . . . corresponding to the value of the funds." Application Note 1 defines the term "value of the funds" as "the amount of the funds involved in the *structuring or reporting conduct*." § 2S1.3 application n.1 (emphasis added). The conduct for which Keleta was convicted—managing an "unlicensed money transmitting business"—involves neither "structuring" nor "reporting." Those offenses are covered by other statutes to which § 2S1.3 applies. See, e.g., 31 U.S.C. §§ 5313 (reporting), 5324 (structuring). Keleta, however, was not charged with, much less convicted of, failing to report financial transactions or structuring transactions to evade reporting requirements. As the term is properly understood, therefore, the "value of the funds" involved in his offense is zero, with a resulting base offense level of 6 and an advisory sentencing range of zero to six months (much lower than the 63–78-month range corresponding to offense level 26 or even Keleta's actual sentence of 31 months).

No published opinion in our circuit or elsewhere has dealt with the application of USSG § 2S1.3(a)(2) to § 1960. *United States v. Abdullahi*, 520 F.3d 890, 896 n.7 (8th Cir. 2008), applied the table to funds transmitted through an unlicensed

money transmitting business, but did not discuss or explain how such conduct could be said to involve either "structuring" or "reporting." One unpublished district court opinion, *United States v. Bariek*, No. 05-150, 2005 WL 2334682, at *2 (E.D. Va. Sept. 23, 2005), applied the table to a licensing offense, reasoning that the application was correct because the Sentencing Commission listed § 1960 among the offenses addressed by § 2S1.3. *Id.* But this evades the question: Did the Commission mean for the increment based on the amount of funds to apply to § 1960 offenses? The Commission could easily have intended that such offenses be assigned a uniform offense level of 6; otherwise, why limit amount-based increases to "the funds involved in the structuring or reporting conduct"?

The court in *Bariek* also argued that "it would be illogical to penalize unlicensed money transmitters without regard to the amount of money they transmitted." *Id.* In a vague sense the argument has some merit: the more money an unlicensed business transmits, the higher the odds of some of the transmissions defeating some public interest, such as the policies trying to thwart the financial activities of terrorist organizations. But the link is far more attenuated than the one between such risks and a failure to *report* a financial transaction—or structuring to avoid reporting—which *directly* undermines the government's ability to track the money. Treasury regulations identify types of transactions required to be reported, obviously the ones perceived as posing the greatest risks, but the government neither charged nor proved a violation of any of those provisions. In its brief here the government claimed that 31 C.F.R. § 103.20 (promulgated pursuant to 12 U.S.C. §§ 1829b, 1951–59; 31 U.S.C. §§ 5311–14, 5316–32) required reporting of Keleta's transactions, but in oral argument it acknowledged that the facts shown satisfied none of § 103.20's provisions. Reporting requirements simply do not track licensing

requirements. Thus, equating failure to secure a license with failure to report misses the obvious difference in the likelihood of harm resulting from each offense. The language of § 2S1.3 does not equate the two; it makes complete sense. We should follow it.