NLO, INC., APPELLANT, *v.* LIMBACH, TAX COMMR., APPELLEE.

[Cite as *NLO, Inc. v. Limbach* (1993), 66 Ohio St.3d 389.]

(No. 92–1381—Submitted April 6, 1993—Decided June 16, 1993.)

*Vorys, Sater, Seymour & Pease, Raymond D. Anderson* and *Eric A. Pierce*, for appellant.

*Lee I. Fisher*, Attorney General, and *Barton A. Hubbard*, Assistant Attorney General, for appellee.

*Per Curiam.*   In Proposition of Law No. 1, NLO argues that it was not the consumer in these transactions because it merely received physical possession of the items, while DOE paid for them and received title.   The commissioner responds that receipt of possession is enough if another pays the consideration for the item.

A "sale," on which the tax is levied (R.C. 5739.02), includes "[a]ll transactions by which title or possession, or both, of tangible personal property, is or is to be transferred, or a license to use or consume tangible personal property is or is to be granted."   R.C. 5739.01(B)(1).   However, no sale occurs when no consideration is paid.   R.C. 5739.01(B); *Barth Corp. v. Schneider* (1966), 6 Ohio St.2d 108, 35 O.O.2d 131, 216 N.E.2d 43.   But, under *Penton Publishing Co. v. Kosydar* (1976), 45 Ohio St.2d 16, 74 O.O.2d 43, 340 N.E.2d 396, a third party may pay the consideration for the transfer to a consumer, who would then owe the tax.   Here, DOE provided the money to pay for the transfer of

the disputed items to NLO, and this payment provided consideration for a sale to NLO.

In *Gen. Motors Corp. v. Limbach* (1989), 44 Ohio St.3d 115, 541 N.E.2d 593 ("*GM* [1989]"), cited for support by NLO, GM hired a construction manager to supervise the remodeling of its assembly plant. The manager received bids, evaluated them, and made recommendations to GM. On GM's approval, the manager issued purchase orders to the contractors and supervised the contractors in the field.

When a contractor submitted a bill, the manager reviewed it and forwarded it to GM for payment. GM then sent a check to the manager, which deposited the money in its account and paid the contractor with its check. The commissioner assessed GM for the entire billing forwarded to GM, and we affirmed.

GM did not argue that the manager, and not GM, was the consumer. Instead, it raised the argument, which we rejected, that the manager performed a personal service and did not transfer any tangible personal property to it. We explained that GM received tangible personal property in these transactions and was required to pay the tax on such transactions. According to the decision, " * * * the commissioner did not assess a tax on a 'personal service' but rather on the transfer, through [the manager], of tangible personal property * * *." 44 Ohio St.3d at 116, 541 N.E.2d at 595. Thus, *GM* (1989) does not support NLO's argument here.

In Proposition of Law No. 2, which is NLO's main argument, NLO contends that it purchased the items and, simultaneously with delivery, resold them to DOE because DOE then obtained title. Consequently, it applies for exception under the resale exception of R.C. 5739.01(E)(1). The commissioner replies that this exception applies only where the resale is to a consumer who uses or consumes the thing. Instead, so she argues, NLO obtained the items, used and consumed them in performing the contract, and did not resell them in the same form received.

R.C. 5739.01(E)(1) states:

"(E) 'Retail sale' and 'sales at retail' include all sales except those in which the purpose of the consumer is:

"(1) To resell the thing transferred or benefit of the service provided, by a person engaging in business, in the form in which the same is, or is to be, received by him[.]"

NLO relies chiefly on *Dresser Indus., Inc. v. Lindley* (1984), 12 Ohio St.3d 68, 12 OBR 60, 465 N.E.2d 430. In *Dresser*, Dresser's Jeffrey Mining Machinery Division contracted with the United States government to design

and develop an explosion-proof electrical enclosure and to engineer the development of a miner-bolter system. Under the contracts, all tangible personal property and services purchased by Jeffrey in performing the contract were to, and did, become the property of the government.

Jeffrey engaged several subcontractors to supply technical and engineering plans, engineering data, prototypes, and equipment. Under the prime contract, the government ultimately received the reports and equipment.

The commissioner assessed Jeffrey's purchases, but we affirmed the BTA's reversal of the commissioner's order. We applied the primary-use test because Jeffrey used the items and thereafter transferred them to the government in the form received by Jeffrey. The court held that Jeffrey's primary purpose in obtaining the items was to resell them as an integral part of the finished product. Our decision rested only in part on the agreement that title to the tangible property created for the projects vested automatically in the government. This agreement compelled Jeffrey to resell the property.

We cannot apply *Dresser* to the instant facts. In *Dresser*, the government hired Jeffrey to invent machinery; here, the government hired NLO to operate its plant and manufacture uranium. In *Dresser*, Jeffrey received reports and prototype equipment to invent and develop machinery; here, NLO used or consumed the purchases, sometimes entirely, in operating the plant. Indeed, many of the disputed purchases were discarded, if not totally consumed, and, thus, possession could not be transferred to the government. Moreover, NLO does not argue that the property had serial uses as in *Dresser*; it argues that it purchased the property with DOE's money and that it resold the property to DOE at the exact time it received it from the vendor. Thus, *Dresser* is not on point.

Furthermore, in *United States v. New Mexico, supra*, the United States Supreme Court held that, under contracts similar to NLO's, sales to the contractor "are in neither a real nor a symbolic sense sales to the 'United States itself.'" 455 U.S. at 743, 102 S.Ct. at 1387, 71 L.Ed.2d at 598. That court characterized these transactions as an effort by the government "to tap the expertise of industry, without subjecting its contractors to burdensome federal procurement regulations." *Id.* at 737, 102 S.Ct. at 1384, 71 L.Ed.2d at 594. The *New Mexico* court ultimately decided that federal immunity does not prohibit the tax; NLO here contends, instead, that state law excepts the disputed sales.

We find that *Gen. Motors Corp. v. Kosydar* (1974), 37 Ohio St.2d 138, 66 O.O.2d 304, 310 N.E.2d 154 ("*GM* [1974]"), presents a better analogy. In *GM* (1974), GM purchased parts from outside suppliers. A supplier needed tooling, *i.e.*, dies, jigs, fixtures and gauges, to manufacture the parts. The

supplier obtained the tooling by either producing it itself or purchasing it from tool houses. GM paid the supplier for the tooling costs. GM then took title to the tooling, even though the supplier maintained possession of the tooling to produce the part. According to the decision, GM took title to prevent the supplier from manufacturing the desired part for any other organization and to enable GM to remove the tooling from the supplier if work stoppages, insolvency, or other inability prevented the supplier from meeting the production schedule. The commissioner assessed GM for the tooling purchases.

We ruled that the contracts between GM and the suppliers were bilateral "requirements contracts." GM granted exclusive licenses to the suppliers to use GM's tooling and bought from the suppliers all of GM's requirements that the suppliers produced with the tooling. In return, the suppliers promised to produce exclusively for GM all the parts GM required. We decided that the suppliers' agreements constituted consideration for the transfer of possession of the tooling to them, so that it was a sale to the suppliers.

We held that GM purchased the tooling by paying for it and receiving title to it, but that GM resold the tooling to the supplier when it placed the supplier in possession. Thus, GM's purchase of the tooling was excepted under the resale exemption because it resold the tooling to the suppliers.

In the instant case, DOE, in a role analogous to GM's, agreed to install NLO in DOE's plants and to purchase whatever NLO needed to purify uranium. NLO agreed to operate the plant under these conditions and transfer all its production to DOE, which agreed to accept all production. Thus, under *GM* (1974), DOE purchased the disputed items and resold them to NLO. Consequently, DOE's purchases are excepted under the resale exception, while the transfers to NLO are not, since NLO is the ultimate consumer. This result, taxing NLO as the consumer, logically extends *GM* (1974).

In Proposition of Law No. 4, NLO argues that the enactment of Am.Sub. H.B. No. 298, eff. July 26, 1991, is a concession that the subject transactions were formerly excepted. The commissioner, conversely, maintains that Am. Sub.H.B. No. 298 codified existing law.

Am.Sub.H.B. No. 298 amended R.C. 5739.01(D), as of August 1, 1991, to define the performer under a facility management contract who purchases property and services to perform the contract as a "consumer." The Act specifically denied exception for this type of purchase under the resale exception.

Prior to *New Mexico*, the commissioner treated these purchases as excepted under the resale exception. The instant case indicates her change of mind. Thus, some confusion existed whether these sales were excepted. However, clarifying the taxable status of a sale falls short of the state's conceding that

the sales were previously excepted. We conclude that this Act codified the law set forth in *GM* (1974).

In Proposition of Law No. 5, NLO contends that the Supremacy Clause of the federal Constitution immunizes NLO's purchases from sales and use taxes.

The federal Supremacy Clause, Clause 2, Article VI, United States Constitution, prevents the state from taxing the federal government and its instrumentalities. In *United States v. New Mexico, supra,* 455 U.S. at 735, 102 S.Ct. at 1383, 71 L.Ed.2d at 592, the court concluded that a state cannot levy a tax "on the United States itself, or on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities, at least insofar as the activity being taxed is concerned." In *New Mexico,* the court held that a sales or use tax did not fall on the federal government and that the contractors were not instrumentalities of the government. This was so because the contractors were privately owned corporations, and government officials did not run their daily operations or have any ownership interest in the corporations.

For this proposition, NLO relies on *Scottsman Mfg. Co., Inc. v. Nevada* (1991), 107 Nev. 127, 808 P.2d 517, certiorari denied (1992), 503 U.S. ——, 112 S.Ct. 1184, 117 L.Ed.2d 427. In *Scottsman,* a DOE contractor agreed to solicit bids for the design, manufacture, and transportation of modular homes to be installed in Nevada for use by DOE. The contractor awarded a subcontract to Scottsman to build the modular homes, and Nevada assessed sales tax against Scottsman on the amounts it received under the contract with the prime contractor.

The Nevada Supreme Court ruled that the district court erred by determining whether the contractor was an instrumentality of the United States. Instead, the Nevada court ruled that the district court should have applied a "legal incidence" test to determine the constitutionality of Nevada's state sales tax. In this test, the court is to determine whether the contractor so lacked an independent role in the purchase of the modular homes as to make the sale—in both a real and symbolic sense—to the United States, even though the prime contractor was not otherwise incorporated into the federal government.

However, under facts very similar to the present ones, the United States Supreme Court, in *United States v. New Mexico,* held that the legal incidence test did not invalidate New Mexico's gross receipts tax, which is functionally equivalent to a sales tax. Conceding that DOE was directly liable to the vendors for the purchase price, the *New Mexico* court found that the contractors had made purchases in their own names, as did NLO here, and that

vendors had not been informed that the government was the only party with an independent interest in the purchase, also as in this case.

Further, NLO now asserts that it was a procurement agent for DOE. However, neither the contract between NLO and DOE nor the purchase orders between NLO and its suppliers formally designate NLO as DOE's "purchasing agent." These documents contain language that NLO is purchasing for and on behalf of DOE, but, under Paragraph 8e of Article III of the contract and under the facts, NLO acquired these items for its work under the contract. Consequently, NLO purchased items for its own use as a consumer and primarily to proceed with its performance under the contract. Finally, as in *New Mexico*, NLO did not need advance government approval for each purchase. Thus, under the legal incidence test, the Supremacy Clause did not immunize these purchases from Ohio's sales tax.

Last, in Proposition of Law No. 3, NLO claims that the tax cannot accrue until after the *New Mexico* issue date because the commissioner, for more than thirty years before *New Mexico*, interpreted the resale exception to grant exception for these purchases. The commissioner replies that she notified DOE when she filed a friend of the court brief in the *New Mexico* case on September 14, 1981, that she no longer adhered to the previous interpretation.

NLO's argument has merit. According to *Ormet Corp. v. Lindley* (1982), 69 Ohio St.2d 263, 266, 23 O.O.3d 257, 259, 431 N.E.2d 686, 689, quoting *Recording Devices, Inc. v. Bowers* (1963), 174 Ohio St. 518, 520, 23 O.O.2d 150, 151, 190 N.E.2d 258, 260:

" ' * * * [A]lthough the equitable principle of estoppel cannot operate against the state of Ohio, and * * * the Tax Commissioner cannot be bound in all cases by acts or opinions of employees, yet where a long-established practice has been followed, such administrative practice does have much persuasive weight especially where the practice has gone on unchallenged for a quarter of a century.' "

*Recording Devices* held that an assessment for 1957 through 1960 could not stand when the Tax Commission had sent the taxpayer a letter in 1938 informing the taxpayer that the transactions were not taxable. *Ormet* held that an assessment for 1973 through 1975 could not stand when the commissioner had mistakingly issued a direct-pay permit in 1965 excepting the disputed equipment from taxation, and cancelled it only in 1977. According to the *Ormet* court, 69 Ohio St.2d at 266, 23 O.O.3d at 259, 431 N.E.2d at 689:

" * * * In both instances an exemption was granted, in writing, by the commissioner. Further, the error continued for an extended period of time. In *Recording Devices* the practice continued for 25 years. In the instant case [*Ormet*], appellee consulted with the commissioner's office during the con-

struction of the plant to ascertain sales and use tax liability on each item of machinery acquired for use in the plant. Mr. Jack W. Winner, a tax agent, was assigned to work with appellee on this project, which began in the mid 1950's. In 1977, Winner, then a supervisor of the audit review section of the commissioner's office, issued the letter cancelling appellee's permit. Thus, while the initial permit arose in 1960, the commissioner's office viewed the carbon anode plant as exempt from the beginning of its construction—over 20 years."

The court distinguished *Ormet* from other "cases in which the taxpayer relie[d] solely upon an alleged verbal statement by an unidentified agent of the Department of Taxation," *e.g., Switzer v. Kosydar* (1973), 36 Ohio St.2d 65, 67, 65 O.O.2d 215, 216, 303 N.E.2d 860, 861. *Id.*

Here, according to an internal memo written by W.J. Grannen, who was NLO's Division Counsel and who testified for NLO at the BTA hearing, NLO's tax-exempt status remained unchanged after a meeting with Tax Commissioner Bowers and Waldemar Haase, Chief of the Department's Legal Division. Haase wrote a contemporaneous letter, in which he suggested NLO continue the same procedures established sometime prior to the meeting. These procedures were set forth in a letter from C.A. Elliott, the Department's Assistant to the Chief of the Division of Sales and Excise Taxes, to George A. Fuller Company, the prime construction contractor at Fernald. According to this letter, the operator of Fernald was to buy all materials and equipment under a certificate of resale and accept from DOE's predecessor, the Atomic Energy Commission, an exemption certificate, in lieu of charging the commission the tax.

NLO has proven a longstanding, thirty-year policy to treat these purchases as exempt as purchases for resale. It was informed of this policy by specific individuals who had authority over the exemption process. Moreover, the commissioner implicitly concedes the effect of these documents; she quibbles about the date NLO knew of her change of mind. In her view, NLO should have known about her change in attitude prior to the beginning of the assessment period in this case, when she filed an *amicus* brief in the *New Mexico* case. We rule that the commissioner can not inferentially inform NLO of her policy change when NLO had letters from her predecessor on this policy. Consequently, NLO's purchases are exempt until the issue date of *United States v. New Mexico.*

Accordingly, we affirm the BTA's decision as to purchases acquired after March 24, 1982, the issue date for *United States v. New Mexico, supra;* we reverse the decision as to the purchases acquired before this date.

*Decision affirmed in part*
*and reversed in part.*

A.W. SWEENEY, DOUGLAS, WRIGHT, RESNICK and F.E. SWEENEY, JJ., concur.

MOYER, C.J., and PFEIFER, J., dissent.