HEALTHSOUTH CORPORATION, APPELLEE, v. LEVIN, TAX COMMR., APPELLANT.

[Cite as *HealthSouth Corp. v. Levin,* 121
Ohio St.3d 282, 2009-Ohio-584.]

(No. 2007–2281—Submitted December 16, 2008—Decided February 17, 2009.)

O'CONNOR, J.

{¶ 1} In this personal-property tax case involving tax year 2002, the Tax Commissioner appeals from a decision of the Board of Tax Appeals ("BTA") that granted appellee, HealthSouth Corporation, a substantial reduction in the taxable value of personal property in 19 Ohio taxing districts. That reduction would lead to significant refunds of property taxes.

{¶ 2} Pursuant to R.C. 5711.26, HealthSouth filed an application for final assessment requesting the reductions. The commissioner issued final assessment certificates without making the requested reductions, explaining that Health-South had not adequately documented its request.

{¶ 3} Reversing the commissioner, the BTA stated that HealthSouth had presented sufficient evidence of value to justify the reductions. The BTA did not, however, specifically address the commissioner's objections to HealthSouth's evidence, and it did not address the commissioner's argument that the refund claim was legally or equitably barred.

{¶ 4} In its appeal to this court, the commissioner challenges HealthSouth's entitlement to refunds on two grounds.

{¶ 5} First, the commissioner argues that the refund claim was barred because the excessive tax payments in this case did not occur as the result of good-faith error or mistake. The commissioner points to evidence that former HealthSouth managers, as part of a scheme to inflate corporate income and assets to attract investors, entered fictitious assets on the company's books that were then reported on property tax returns. HealthSouth's claim seeks to remove the fictitious assets from the tax assessment and thereby obtain a refund of overpayments. The commissioner argues that the deliberately false reporting of the assets should defeat HealthSouth's claim as a matter of law and equity.

{¶ 6} Second, the commissioner renews his contention that HealthSouth failed to provide sufficient documentation of the amount of taxable value that was fraudulently reported on the company's original return for 2002.

{¶ 7} We find no support for the commissioner's first argument in the Ohio statutes and the case law. We hold that the property tax statutes do not authorize the commissioner or the BTA to refuse to reduce a tax assessment on the grounds that the excess taxable value was reported as part of an accounting fraud. Additionally, we hold that the circumstances presented do not justify recognizing estoppel as a bar to HealthSouth's claim. Because the correction and

refund claim were not barred as a matter of law, the BTA was obligated to determine whether HealthSouth had submitted sufficient evidence to document the fictitious and fraudulent assets originally reported in Ohio taxing districts. The BTA failed to make that determination. Accordingly, we vacate the BTA's decision and remand to the BTA to evaluate the evidence in light of the commissioner's objections.

## Relevant Background

### *The Fraud and Fictitious Assets*

{¶ 8} On March 19, 2003, the Securities and Exchange Commission filed suit against HealthSouth and its chairman, Richard M. Scrushy, claiming that Health-South had deliberately overstated its earnings by at least $1.4 billion in 1999. Within weeks, nearly a dozen current and former HealthSouth executives, including all five who had served as chief financial officer, pleaded guilty to criminal violations of the federal securities laws and related statutes. In conjunction with these events, the corporation's board of directors established a Special Audit Review Committee on March 22, 2003.

{¶ 9} That committee examined the corporation's accounting for the period 1996 through 2002 and determined that "accounting fraud at HealthSouth was by any standard both enormous and complex." HealthSouth misstated revenues and expenses to inflate earnings, a fraud that involved making over $2.7 billion in false or unsupported entries in the accounting systems. The concealment of revenue inflation involved transfers out of a corporate "suspense account" (an account used temporarily for doubtful receipts, disbursements, or discrepancies pending their analysis and permanent classification) onto the balance sheets of various HealthSouth facilities. Because the adjustments were so large and difficult to account for, the corporation invented more than $1 billion in fictitious assets in order to conceal income-statement fraud.

### *Removal of the Fictitious Assets*

{¶ 10} As of December 31, 2001, the tax lien date at issue, HealthSouth owned multiple health-care facilities in Ohio, including physical rehabilitation, surgery, and sports medicine centers. It paid personal-property tax on the tangible personal property utilized in providing services at those locations.

{¶ 11} For tax year 2002, HealthSouth filed an intercounty return with the Tax Commissioner on June 19, 2002. Spreadsheets were submitted with the return purporting to detail the assets at the Ohio locations. The Tax Commissioner issued preliminary assessment certificates based on the return on August 12, 2002. Those certificates reveal personal property in 19 taxing districts throughout Ohio. Total assessed value equaled $5,262,130.

{¶ 12} On August 4, 2004, HealthSouth filed its application for final assessment, which sought to correct the tax assessment for 2002 and thereby obtain refunds of excess taxes that had been paid with respect to that tax year. In support of the application, HealthSouth submitted a set of spreadsheets called "Amended Fixed Assets." The application was filed, and the Amended Fixed Asset list was prepared by Brian T. Scully, an outside representative associated with the accounting firm KPMG, L.L.P. The underlying business records, however, were not submitted. The method HealthSouth apparently employed in making the correction consisted of simply removing from the assessment items with a certain designation.[1] The application, if accepted, would reduce the total assessed value by $2,668,679.

{¶ 13} In reviewing the application, the commissioner requested that Health-South submit "full and detailed journal entries that are reflective of the write-off and/or write-down of these assets in Ohio showing that the originally reported costs have been written off of the books of HealthSouth Corporation." Health-South did not comply. On July 15, 2005, the commissioner issued final assessment certificates along with a cover letter noting "a lack of evidence to establish that these items have fully been removed from the assets as required by [generally accepted accounting principles]." As a result, the final assessment certificates reflect a "0 change in list value."

{¶ 14} At the BTA hearing on appeal of the commissioner's ruling, Health-South presented the testimony of Michael D. Martin, a vice-president of tax who oversees sales, use, and property tax obligations, and a number of exhibits. HealthSouth presented the evidence in an attempt to justify its request for reduction through revised financial statements and business records. But the Tax Commissioner strenuously objected to Martin's testimony as relying on hearsay and as lacking a foundation of personal knowledge. The commissioner also challenged some exhibits as insufficiently authenticated.

{¶ 15} At the conclusion of the BTA hearing, the commissioner advanced the theory that HealthSouth's claim was barred because the fictitious assets were reported as part of a deliberate fraud. The commissioner did not file a brief.

{¶ 16} In its decision, the BTA reversed the commissioner. Without specifically addressing the commissioner's objections to HealthSouth's evidence, the BTA found that HealthSouth had proved its case. The BTA did not address the commissioner's argument that the claim was barred because of the underlying fraud.

---

1. The evidence submitted by HealthSouth established that the designation "AP SUMMARY" with all capital letters was associated with fictitious assets. To the extent that HealthSouth also sought to remove assets designated "AP Summary" (lower case letters) from the assessment, the removal of those assets does not appear to be justified. The BTA should address this issue on remand.

## Analysis

### *Ohio law does not condition corrective reductions of property tax assessments on a good-faith mistake*

{¶ 17} In his first proposition of law, the commissioner argues that a taxpayer's intentional overreporting of asset values and resultant tax due for the purpose of concealing the taxpayer's own accounting fraud operates to bar any refund of the overpaid taxes. Before we address this argument, we note that HealthSouth contends that the Tax Commissioner waived the argument because he did not file a brief at the BTA.

{¶ 18} Under the present circumstances, HealthSouth's argument has no merit. The Tax Commissioner forcefully presented the argument in a closing statement to the BTA. Although the commissioner did not follow up by filing a brief, that does not mean he waived or abandoned the argument. When a party before the BTA files no brief at all, that omission does not justify the conclusion that the party has abandoned arguments that it had previously advanced during the BTA hearing.[2] We thus turn to the merits of the commissioner's argument.

{¶ 19} Our review of the property tax statutes leads us to conclude that the rights to have an assessment corrected and to receive a refund of property taxes do not depend on good faith by the taxpayer in filling out the original property tax return. Under Ohio law, the process consists of several steps. First, the assessment is corrected, and any deficiency or excess in relation to prior assessments is noted. The corrected assessment is then certified to the county auditor. R.C. 5711.26. When there is an excess, county officials take action that leads to a refund or to a credit against future taxes. R.C. 5711.32(A)(1) and 319.36. At neither stage does the law condition relief on the taxpayer's good faith, nor does the law confer discretion on officials to deny the taxpayer relief on those grounds.

{¶ 20} Of particular importance in this context is the mandatory language of R.C. 5711.26. As noted, R.C. 5711.26 specifically requires that the commissioner "shall" issue a final assessment certificate when a taxpayer timely applies for one. This mandatory language was enacted in 1982 and superseded court decisions that had recognized the commissioner's discretion to decline to act on such an application—a refusal that would allow the preliminary assessment to become final without the corrections the taxpayer desired. Am.Sub.H.B. No. 379, 139 Ohio Laws, Part II, 2589, 2620; see *Michelin Tire Corp. v. Kosydar* (1975), 45

---

2. By contrast, the omission of an argument from a party's brief may be deemed to waive that argument. *E. Liverpool v. Columbiana Cty. Budget Comm.*, 116 Ohio St.3d 1201, 2007-Ohio-5505, 876 N.E.2d 575, ¶ 3, citing *Household Fin. Corp. v. Porterfield* (1970), 24 Ohio St.2d 39, 46, 53 O.O.2d 22, 263 N.E.2d 243.

Ohio App.2d 107, 108, 74 O.O.2d 126, 341 N.E.2d 626, paragraph four of the syllabus (under former R.C. 5711.26, commissioner "ha[d] discretion whether to make a final assessment").

{¶ 21} By *requiring* the commissioner to finally assess when the taxpayer asks him to do so—and thereby removing his discretion to say no—the General Assembly intended that the commissioner may not refuse to correct an assessment unless the reason for the refusal is listed in the statute. See *Avco Corp. v. Limbach* (1990), 51 Ohio St.3d 147, 149, 555 N.E.2d 284 (taxpayer's failure to file formal "claims for deduction from book value" did not justify denying final assessment, because R.C. 5711.26 does not state such a basis as a ground for denial).

{¶ 22} The foregoing discussion establishes that the out-of-state cases the commissioner cites are not apposite. *Ex parte HealthSouth Corp.* (Ala.2007), 978 So.2d 745, 751 ("the words 'error' and 'mistake' are not consistent with dishonest acts"); *HealthSouth Corp. v. Waterbury* (Mar. 13, 2008), Conn.Super. Nos. CV054011048, CV054010916, CV054010807, CV054002794, and CV054006234, 2008 WL 853304 (HealthSouth not entitled to mandamus compelling tax officials to remove personal property from tax lists, because officials had discretion to determine whether "error" existed). Quite simply, the language of the Ohio statutes materially differs from those of foreign jurisdictions: property tax refunds in Ohio do not depend on finding an "error" or "mistake" by the taxpayer.

### Estoppel does not apply in this case

{¶ 23} The Tax Commissioner frankly acknowledges that his proposition of law can properly be seen as invoking an "accounting fraud estoppel." He seeks support for his position not from any language in the statutes, but from other tax cases in which, he claims, courts have applied an estoppel-like reasoning.

{¶ 24} The case law militates against recognizing estoppel in this case. In *Gen. Motors Corp. v. Limbach* (1993), 67 Ohio St.3d 90, 93, 616 N.E.2d 204, this court declined to apply "equitable recoupment" because "we have not applied equitable principles to tax matters." [3] See *Columbus S. Lumber Co. v. Peck* (1953), 159 Ohio St. 564, 569, 50 O.O. 457, 113 N.E.2d 1 (as an administrative agency, the BTA "does not have equitable jurisdiction").

{¶ 25} Moreover, the case law does not support recognizing estoppel in this case even if that doctrine were generally applicable in tax matters. The Tax Commissioner relies on four cases in which this court is said to have applied

---

3. Because relief under tax statutes is not equitable in character, the "clean hands" doctrine does not apply.

"estoppel principles" in tax cases. Two of the cases, *Youngstown Sheet & Tube Co. v. Lindley* (1988), 38 Ohio St.3d 232, 527 N.E.2d 828, and *Lyden Co. v. Tracy* (1996), 76 Ohio St.3d 66, 666 N.E.2d 556, addressed sales-tax issues under R.C. 5739.16(B). Both are inapposite, because they merely construe and apply statutory language to the circumstances of the particular case before the court.

{¶ 26} The other cases—*NLO, Inc. v. Limbach* (1993), 66 Ohio St.3d 389, 613 N.E.2d 193, and *Ormet Corp. v. Lindley* (1982), 69 Ohio St.2d 263, 23 O.O.3d 257, 431 N.E.2d 686—presented situations in which high-level tax officials repeatedly assured a taxpayer, in writing and over a period of decades, that particular property was exempt. Then the commissioner reversed himself and issued a retroactive assessment. In striking down the assessment, this court in each case invoked the concept of " 'administrative practice' " having " 'persuasive weight' " in the court's determining how to apply the law during a given period. *NLO* at 395, 613 N.E.2d 193; *Ormet* at 266, 23 O.O.3d 257, 431 N.E.2d 686, both quoting *Recording Devices, Inc. v. Bowers* (1963), 174 Ohio St. 518, 520, 23 O.O.2d 150, 190 N.E.2d 258. The commissioner insists that these cases involve an estoppel doctrine that may be applied against the taxpayer, but that notion is mistaken. The doctrine of "administrative practice" advanced in *Ormet* and *NLO* constitutes a very narrow exception to the rule that estoppel does not generally apply in tax cases. *Ormet*, 69 Ohio St.2d at 265, 23 O.O.3d 257, 431 N.E.2d 686. The doctrine applies against the state when the state has interpreted the law in favor of a particular taxpayer in writing and has adhered to that interpretation over an extended period of time, but later corrects its interpretation and attempts to assess taxes retroactively in accordance with the new interpretation. Id. at 266, 23 O.O.3d 257, 431 N.E.2d 686. By contrast to *Ormet* and *NLO*, it is the taxpayer in this case who requests correction of an assessment that was based on its own original report, and no past administrative practice is at issue. As a result, *Ormet* and *NLO* are simply not apposite.

{¶ 27} The commissioner also relies on *William Bayley Co. v. Lindley* (Mar. 28, 1979), Clark App. No. 1308, 1979 WL 208325. In that case, a taxpayer had a demand note on its books to which it had assigned a value of over $1.6 million, but the taxpayer did not report the note on its intangible-property tax return. When the commissioner issued an assessment on the note, the taxpayer protested, arguing that the assigned value was not the actual value, that it had later written the note off as bad debt, and that the note had no value when it was on the books. Although the appellate court wanted to avoid "recogniz[ing] a corporate fraud upon the public," the court appears to have placed primary reliance on the doctrine that "[t]he assignment of book value is prima facie evidence of true value" in deciding that the taxpayer had not discharged its burden of establishing the worthlessness of the note. *Bayley* does not support applying estoppel under the circumstances presented here.

{¶ 28} Nor does the present case fit the standard pattern of estoppel based on fraud. The government is not the primary victim of the fraud in this case. Indeed, in the short term, the taxing districts benefited from the overpayment of taxes. By contrast, innocent shareholders were induced to invest in HealthSouth based on the representation that the corporation had more income and greater assets than it actually possessed. The former HealthSouth management has already defrauded these investors once. If the government is allowed to escape an obligation to refund, those persons may be further victimized by the failure of the company to recover the overpayment.

{¶ 29} The argument has been made that innocent investors in a corporate enterprise assume the risks of their investment, even those risks arising from corporate wrongdoing. C. Boise, Playing with Monopoly Money: Phony Profits, Fraud Penalties and Equity (2005), 90 Minn.L.Rev. 144, 201. The flaw in this theory lies in its incompatibility with the main purpose behind securities laws, which is " ' "to substitute a philosophy of full disclosure for the philosophy of *caveat emptor.*" ' " *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.* (1994), 511 U.S. 164, 171, 114 S.Ct. 1439, 128 L.Ed.2d 119, quoting *Affiliated Ute Citizens of Utah v. United States* (1972), 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741, quoting *Secs. & Exchange Comm. v. Capital Gains Research Bur.* (1963), 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237. Although it is certainly true that investors in the equity markets might be victimized by corporate wrongdoing, they do not thereby "assume the risk" of the resulting losses in a legal or equitable sense.

### The BTA did not explain how HealthSouth sustained its burden of proof

{¶ 30} Although HealthSouth may obtain a refund if it proves its case, the BTA's decision failed to address whether HealthSouth did prove its case. When a taxpayer appeals a determination of the commissioner to the BTA, the commissioner's determination is presumed to be correct, and the taxpayer must shoulder the burden of rebutting that presumption. See *Shiloh Automotive, Inc. v. Levin,* 117 Ohio St.3d 4, 2008-Ohio-68, 881 N.E.2d 227, ¶ 16 (the taxpayer bears the burden "to show the manner and extent of the error in the Tax Commissioner's final determination" and to demonstrate that the commissioner's findings are "clearly unreasonable or unlawful").

{¶ 31} HealthSouth presented evidence of its entitlement to a reduction with its return, through its refund claim, and at the BTA. The commissioner found the evidence insufficient and raised significant objections to the evidence presented at the BTA. In particular, the commissioner asserted that the documentation presented did not show that fictitious assets were ever created or that the accounting entries reflecting those assets were ever reversed or removed. The

commissioner also objected to the testimony of the witness at the BTA as not competent to authenticate and verify the documentation.

{¶ 32} In determining that HealthSouth had proved its case, all the BTA said was that "nothing in the record * * * indicate[d] any impropriety in the methodology" that HealthSouth used; that HealthSouth "arguably utilized a viable, alternative means of establishing the assets that did exist"; and that "nothing in the record [indicated] that the amounts sought through the refund request were erroneous * * *."

{¶ 33} None of these statements remotely address the questions of sufficiency of the evidence raised by the commissioner. Indeed, the BTA's statements make it appear that the board unlawfully placed the burden on the commissioner to show why HealthSouth's appeal should fail.

{¶ 34} We have held that in deciding the appeals before it, the BTA has the duty to state what evidence it considered relevant in reaching its determination. *Howard v. Cuyahoga Cty. Bd. of Revision* (1988), 37 Ohio St.3d 195, 197, 524 N.E.2d 887. When the BTA fails to fulfill that duty, the proper course pursuant to *Howard* is to remand the case so that the BTA can perform the task.

{¶ 35} In so doing, we clarify that we do not hold here that the BTA reached the wrong conclusion. As HealthSouth asserts, we do not sit as a "super BTA." *Strongsville Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 112 Ohio St.3d 309, 2007-Ohio-6, 859 N.E.2d 540, ¶ 22. Rather, we must defer to the BTA's factual findings. *Satullo v. Wilkins*, 111 Ohio St.3d 399, 2006-Ohio-5856, 856 N.E.2d 954, ¶ 14.

{¶ 36} We find only that the BTA's decision in its current form does not properly evaluate the evidence before it in light of the commissioner's objections. Under these circumstances, we hold that the BTA's fact-finding is incomplete, and we therefore vacate its decision and remand the case to the BTA. On remand, the BTA shall complete its fact-finding based upon the existing record. Because the parties have been afforded ample opportunity to present evidence, the BTA shall not take additional evidence on remand.

## Conclusion

{¶ 37} For all the foregoing reasons, the decision of the BTA must be vacated and the case remanded for further proceedings consistent with this opinion.

Decision vacated
and cause remanded.

MOYER, C.J., and PFEIFER, O'DONNELL, and CUPP, JJ., concur.

LUNDBERG STRATTON and LANZINGER, JJ., concur separately.

LUNDBERG STRATTON, J., concurring.

{¶ 38} I agree with the decision to remand this case on the failure of HealthSouth to provide sufficient documentation of its assets to justify a refund.

{¶ 39} I also reluctantly agree that the language of R.C. 5711.26, as amended in 1982, now appears to require the commissioner to issue such a refund by removing the commissioner's discretion in such cases. While the majority laments the loss to the "innocent investors" caused by the corporate fraud, I believe that the government and taxing districts are also primary victims of the fraud. While the taxing districts may have temporarily benefited from the overpayment of taxes by HealthSouth (and therefore presumably adjusted their budgets to reflect the extra income), those same taxing districts, if a refund is upheld on remand, will now be forced, in these very difficult economic times, to come up with funds to repay those tax benefits received. And what is worse, those funds will go back to a corporation that has admitted to massive fraud.

{¶ 40} But since the law seems to tie our hands, these are policy arguments that should be directed to the General Assembly so that it may consider changing the statute. Both Alabama in *Ex parte HealthSouth Corp.* (Ala.2007), 978 So.2d 745, and Connecticut in *HealthSouth Corp. v. Waterbury* (Mar. 13, 2008), Conn.Super. Nos. CV054011048, CV054010916, CV054010807, CV054002794, and CV054006234, 2008 WL 853304, denied refunds to HealthSouth, in cases almost identical to the one before us now, because of the language of their statutes and the discretion afforded their tax officials in cases of fraud.

{¶ 41} Therefore, I reluctantly agree that the Ohio tax statute does not prohibit refunds based on fraud, but agree that the matter should be remanded for further proof on the merits.

LANZINGER, J., concurs in the foregoing opinion.

---

Siegel, Siegel, Johnson & Jennings Co., L.P.A., and Nicholas M.J. Ray, for appellee.

Richard Cordray, Attorney General, and Barton A. Hubbard, Assistant Attorney General, for appellant.