**UNITED STATES of America, Appellee,**

v.

**John M. BOVE and Theodore J. Cervini, Defendants,**

**Thomas J. Zeppieri, Defendant–Appellant.**

**Docket No. 97–1239.**

United States Court of Appeals, Second Circuit.

Argued May 12, 1998.

Decided Aug. 13, 1998.

**SHADUR, Senior District Judge:**

Thomas Zeppieri ("Zeppieri") appeals from the sentence imposed by the United States District Court for the Northern District of New York (Thomas J. McAvoy, *Chief Judge*) after Zeppieri had entered a guilty plea to (1) one count of subscribing to a false tax return in violation of 26 U.S.C. § 7206(1) and (2) one count of conspiring to structure financial transactions to evade reporting requirements in violation of 18 U.S.C. § 371. Application of the sentencing guidelines ("Guidelines") produced a concurrent prison sentence of 12 months and 1 day on each count, a three-year term of supervised release, a $100 special assessment and a $15,000 fine. Before us Zeppieri challenges various aspects of the Guideline calculations that produced his custodial sentence. We affirm certain of the disputed aspects of the district court's calculations, but because we find that other of those aspects were in error, we remand the case for resentencing.

### Background

In May 1994 Adirondack Entertainment and Recreation, Inc. ("Adirondack"), a corporation whose officers included Chief Executive Officer Zeppieri, President Thomas Cervini ("Cervini"), Vice-president John Bove ("Bove") and Secretary-treasurer Robert Signoracci, began negotiations with Karis Realty, Inc. ("Karis") to lease a parcel of property in Lake George Village, New York that included an amusement arcade and a miniature golf course. Karis was represented in those discussions by its President Charles Yagar and its Secretary-treasurer Jilda Yagar ("Jilda") (collectively "Yagars"). Eventually the parties agreed orally on a payment of $50,000 for the lease, half of which was to be paid directly to the Yagars as a concealed cash transaction. Pursuant to that oral agreement, Cervini wrote two checks on Adirondack's bank account—one for $25,000 to acquire the lease and another for $5,000 to secure an option to purchase the Lake George property. Cervini and Zeppieri then delivered those checks to Jilda along

Sara M. Lord, Assistant United States Attorney for the Northern District of New York, Albany, New York (Thomas J. Maroney, United States Attorney, of counsel), for Appellee.

Phillip G. Steck, Cooper, Erving, Savage, Nolan & Heller, LLP, Albany, New York, for Defendant–Appellant.

Before: WINTER, Chief Judge, McLAUGHLIN, Circuit Judge, and SHADUR,* Senior District Judge.

* The Honorable Milton I. Shadur, of the United States District Court for the Northern District of Illinois, sitting by designation.

with $25,000 in cash and a lease agreement that falsely stated a $25,000 payment for the lease.

On August 15, 1994 Yagars agreed to sell the property to Adirondack for $950,000. Because the agreed-upon deal called for a secret $100,000 cash payment to Yagars at the closing, on October 19 of that year the parties signed documents that misrepresented the purchase price as $850,000. Adirondack then tendered $50,000 in cash and a $50,000 cashier's check to Yagars. Yagars refused to accept the check and demanded an additional $50,000 in cash to conform to the parties' agreement.

Shortly thereafter Zeppieri drafted or received six checks totaling $50,000, each made payable to "Cash" for an amount less than $10,000 (apparently to evade the issuance of currency transactions reports).[1] On the following day Bove and Zeppieri either personally cashed or arranged for the cashing of each check, and they then delivered $50,000 to Yagars to complete the real estate transaction. On January 19, 1995 Zeppieri, in response to questions posed by a federal agent, reaffirmed as accurate the fraudulently-prepared real estate documents showing an $850,000 purchase price.

In addition to his position at Adirondack, Zeppieri was the President and majority shareholder of Z's Amusements Inc. ("Amusements"), a company that operated amusement game and vending machines. During the grand jury investigation into the fraudulent real estate transaction, it was discovered that a large number of Amusements' corporate checks had been written to cover Zeppieri's personal expenses. Amusements improperly deducted those items as corporate expenses on its 1992 and 1994 tax returns.[2] For his part Zeppieri failed to declare that income on his 1992–1994 personal returns, so that both the corporate and Zeppieri's personal income were severely underreported.

As stated at the outset of this opinion, in accordance with the plea agreement Zeppieri plead guilty to (1) one count of conspiring to structure financial transactions to evade reporting requirements and (2) one count of subscribing to a false tax return for the 1993 tax year. At Zeppieri's March 20, 1997 sentencing hearing the district court determined that the Guideline base offense level for the conspiracy count was 6, to which the judge then added 5 levels to reflect the fact that $50,000 was the amount that had been structured (Guideline § 2F1.1(b)(1)(F)). As to the tax count, the district court calculated a tax loss of $41,912, for which Guideline § 2T4.1(H) prescribed an offense level of 13, to which the judge then added 2 levels because he found that the offenses in the two counts did not group (Guideline § 3D1.4) and deducted 2 levels for acceptance of responsibility (Guideline § 3E1.1(a)).

Because first offender Zeppieri was in Criminal History Category I, the adjusted offense level of 13 yielded a sentencing range of 12 to 18 months (Sentencing Table Ch. 5 Pt. A). After the district judge imposed a sentence at the low end of that range, Zeppieri appealed the district court's order and was granted a stay of his sentence pending the outcome of this appeal.

### Standard of Review

As we have frequently noted, we review the district court's legal interpretation of the Guidelines de novo and review the related factual findings under the clearly erroneous standard (*United States v. Escotto,* 121 F.3d 81, 85 (2d Cir.1997)). In the latter respect, *United States v. Macklin,* 927 F.2d 1272, 1282 (2d Cir.1991)(internal quotation marks omitted) teaches:

> A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

### Tax Loss Calculation

Zeppieri first challenges his sentence on the ground that the district court erroneous-

---

1. 31 U.S.C. § 5313(a) prescribes that financial institutions must file reports of multiple currency transactions in excess of $10,000 during any business day.

2. Amusements failed to file a 1993 corporate tax return.

ly calculated the "tax loss" attributable to him in determining the base offense level for his filing of a false tax return. We review that determination de novo (*Escotto*, 121 F.3d at 85).

Guideline § 2T1.1(a) directs that the base offense level be derived from the tax table in Guideline § 2T4.1 in terms of the "tax loss," which Guideline § 2T1.1(c)(1) defines as "the total amount of loss that was the object of the offense (*i.e.*, the loss that would have resulted had the offense been successfully completed)." Guideline § 2T1.1 Application Note 7 goes on to provide that "[i]f the offense involves both individual and corporate tax returns [as is the case here], the tax loss is the aggregate tax loss from the offenses taken together."

■ At the time of sentencing this Court had not yet addressed the appropriate aggregation methodology for calculating the tax loss when a defendant both understates income on his or her corporate income tax return and fails to report the receipt of diverted funds on his or her personal tax return. In reliance on the Sixth Circuit's opinion in *United States v. Cseplo*, 42 F.3d 360, 362–64 (6th Cir.1994), the district court applied a corporate tax rate of 34% to the unreported corporate income and an individual tax rate of 28% to the full amount of unreported individual income (undiminished by the imputed corporate tax). Those calculations produced the already-referred-to aggregate tax loss of $41,912, and the consequent base offense level of 13 (Guideline § 2T4.1(H)).

But the *Cseplo* approach was not universally shared. At sentencing Zeppieri argued that the district court should instead follow *United States v. Harvey*, 996 F.2d 919, 920–21 (7th Cir.1993), which explicitly rejected the aggregation approach endorsed in *Cseplo* on the premise that it overstated the revenues lost to the Treasury and essentially amounted to double taxation in the calculation of the tax loss. *Harvey, id.* held that when a single crime causes both corporate and personal income to be understated, the tax loss should be computed sequentially— that is, the amount that should have been paid as corporate tax should be deducted

from the individual's unreported income before the tax loss on the personal income side is calculated.

If the district court had used the *Harvey* aggregation method, Zeppieri's tax loss would have been less than $40,000, dropping the base offense level to 12 (Guideline § 2T4.1(G)). When combined with Zeppieri's Criminal History Category of I, that lower offense level would produce a sentencing range in Zone C of the Sentencing Table, thus qualifying Zeppieri for a split sentence, under which as much as half of his sentence could take the form of supervised release with a condition that substitutes community confinement or home detention for full-fledged custodial time (Guideline § 5C1.1(d)(2)).

Just a week before oral argument in this case, a panel of this Court resolved the issue in *United States v. Martinez–Rios*, 143 F.3d 662 (2d Cir.1998). *Martinez–Rios, id.* at 672 chose the Seventh Circuit's *Harvey* approach rather than the *Cseplo* method followed by the district court. We therefore remand the case to the district court for sentencing based on a recalculation of Zeppieri's tax loss in light of the principles recently announced in *Martinez–Rios*.

### Inclusion of W–2 Income

■ Zeppieri also contends that the district court improperly considered some noncharged conduct—his failure to declare $14,800 in W–2 income in tax year 1992—in calculating the tax loss for Guideline purposes. According to Zeppieri, the only tax deficiencies that the district court should have considered were those attributable to the criminal activity actually charged in the indictment. We reject that argument.

Guideline § 1B1.3 directs sentencing courts to consider all "relevant conduct" when calculating a defendant's base offense level. In turn Guideline § 1B1.3(a)(1)(A)(emphasis added) defines "relevant conduct" to include "*all* acts and omissions committed ... *by the defendant* ... that occurred during the commission of the offense of conviction." That broadly in-

clusive language clearly encompasses both charged and non-charged conduct.

Relatedly, the interpretive and explanatory commentaries to Guideline § 1B1.3 confirm that a defendant need not have been charged or convicted of those related acts or omissions for them to qualify as relevant conduct. As Application Note 1 explains:

> The principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability. Under subsections (a)(1) and (a)(2), the focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a principal, accomplice, or conspirator.

That proposition is further confirmed by the Background comment:

> Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range.

Unsurprisingly, the inclusion of non-charged relevant criminal conduct in the tax loss calculation used to set the base offense level is supported by caselaw from several of our sister Circuits (see, e.g., *United States v. Noske,* 117 F.3d 1053, 1060 (8th Cir.1997); *United States v. Meek,* 998 F.2d 776, 781–82 (10th Cir.1993); *United States v. Daniel,* 956 F.2d 540, 544 (6th Cir.1992)). It is beyond cavil that Zeppieri's failure to declare certain W–2 income in his 1992 tax return amounts to criminal conduct under the tax code. Accordingly we hold that the district court properly considered that non-charged conduct in calculating the tax loss attributable to Zeppieri for purposes of determining his base offense level under Guideline § 2T1.1.

### Conspiracy Offense

■ Next Zeppieri urges that the district court improperly applied the Guidelines in calculating the base offense level for the conspiracy offense. Under Guideline § 2X1.1(a) that level looks to the Guideline for the underlying substantive offense. Where as here the offense is 18 U.S.C. § 371 structuring, Guideline § 2S1.3(a) establishes an initial base offense level of 6, to which is added the same number of offense levels that the fraud and deceit table in Guideline § 2F1.1 prescribes for the value of the funds involved. And on that score Guideline § 2S1.3 Application Note 1 explains that " 'value of the funds' means the amount of the funds involved in the structuring or reporting conduct." Because Zeppieri was found to have structured a total of $50,000, for which Guideline § 2F1.1(b)(1)(F) would prescribe a 5–level enhancement, the resultant base offense level would be 11.[3]

But Zeppieri maintains that he was entitled to an offense level reduction under Guideline § 2S1.3(b)(2), which mandates a decrease to level 6 if four conditions (A) through (D) are met:

1. Zeppieri did not know or believe that the funds were the proceeds of unlawful activity, or were intended to promote unlawful activity.

2. Zeppieri did not act with reckless disregard of the source of the structured funds.

3. Those funds were the proceeds of lawful activity.

4. Finally, the funds were used for a lawful purpose.

Because both Zeppieri and the government agree that Zeppieri has satisfied the first three of those conditions, what remains at issue is the meaning to be ascribed to the fourth requirement—what is intended by its "lawful purpose" phrase.

It was the district court's view that because the funds ultimately wound up in a cash form that enabled Yagars to commit tax evasion, they were by definition used for an unlawful purpose. That, however, reflects a misunderstanding of the relevant Guideline language. Guideline § 2S1.3(b)(2)(D) speaks in terms of the purpose for which the structured funds were used by the defendant—

---

**3.** In that respect the government did not seek either of the sentencing enhancements provided for in Guideline § 2S1.3(b)(1) and (c)(1).

whether for a legal or an illegal purpose. And here the funds themselves were used for Adirondack's wholly lawful purpose of purchasing real estate. In terms of Guideline § 2S1.3(a) and (b), then, we hold that the district court's determination that Zeppieri used the *funds* for an unlawful purpose was incorrect as a matter of law.

We do note that Guideline § 2S1.3(c) sets out a rule, under the caption "Cross Reference," that can trump Guideline § 2S1.3(a) and (b):

> If the offense was committed for the purposes of violating the Internal Revenue laws, apply the most appropriate guideline from Chapter Two, Part T (Offenses Involving Taxation) if the resulting offense level is greater than that determined above.

And in this instance the *offense* of structuring was clearly committed for the known purpose of facilitating Yagars' contemplated tax evasion, even though the *funds* themselves were obtained and used for the lawful purpose of buying Yagars' real estate.

But the government did not seek Zeppieri's sentencing on that predicate at the district court level (or before us), and we are disinclined to address the matter on a basis never argued at any stage of the case. Instead, on the already-ordered remand the district court is instructed to reduce the conspiracy count's base offense level to 6 pursuant to Guideline § 2S1.3(b)(2).

### Grouping of Offenses

■ Zeppieri finally urges that the district court erred in refusing to group the conspiracy and tax offenses for sentencing purposes.[4] Guideline § 3D1.2 dictates that "[a]ll counts involving substantially the same harm shall be grouped together...." It then goes on to identify four alternative methods to determine what constitutes "substantially the same harm," as to which Guideline § 3D1.2 Application Note 7 expressly states that the methods are alternative and that any one or more may be applied. As we observed regarding that Guideline in *United States v. Mizrachi,* 48 F.3d 651, 654 (2d Cir.1995):

> Under this analysis, closely related counts are, in effect, treated as a single offense, *id.* § 3D1.2, and counts not closely related receive incremental penalties that produce a total sentence significantly less than what would have resulted if the sentences were calculated for each count separately and then aggregated, *id.* § 3D1.4.

In those terms Zeppieri maintains that his two offenses are "closely related." But that contention simply does not survive analysis.

First, the two schemes did not "involve the same victim," thus negating the potential applicability of Guideline §§ 3D1.2(a) and (b). From that perspective, the crime charged in the conspiracy count had multiple victims: It not only illegally reduced the income taxes collected by the federal government from Yagars but also deprived the local government of its full entitlement to real estate taxes and cheated all Karis shareholders other than the Yagars out of $100,000. Zeppieri's tax scheme, however, had no individual victim—instead it implicated "the public interest in preserving the integrity of the nation's tax system" (Guideline § 2T1.1 Introductory Commentary). But even if that distinction were to be viewed as nonmaterial:

> 1. Both counts clearly did not involve "the same act or transaction," thus rendering Guideline § 3D1.2(a) inapplicable.

> 2. Nor were the acts or transactions in the two counts "connected by a common criminal objective," nor did they "constitut[e] part of a common scheme or plan,"[5]

---

4. At oral argument Zeppieri's counsel characterized his arguments under Guideline § 2S1.3(b) and on the grouping issue as inversely related, so that his victory on the former—as we have just ordered—would automatically result in his defeat on the issue to which we now turn. Because no such automatic correlation exists, we will proceed with a separate analysis of the grouping question (although, as will be seen, our resolution of the Guideline § 2S1.3(b) issue does have a bearing here).

5. On that score, "the identity of the participants in the [two offenses] was not constant" (see *United States v. Chartier,* 970 F.2d 1009, 1016 (2d Cir.1992)). On the one hand, the conspiracy count involved multiple parties—Zeppieri, Bove, Cervini, Signoracci and Yagars. By contrast, Zeppieri acted alone in evading his own income taxes.

so that Guideline § 3D1.2(b) is not in it either.

It does not require any discussion to rule out Guideline § 3D1.2(c), for there is no basis for asserting that either of the counts "embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to ... the [other] count[ ]." That then leaves only Guideline § 3D1.2(d) for possible consideration among the alternative definitions of "substantially the same harm."

That alternative applies by its terms to offenses that are covered by certain specified guidelines, but only under limited conditions—and the only such condition that is potentially applicable here would exist if "the offense level is determined largely on the basis of the total amount of harm or loss" (Guideline § 3D1.2(d)). In that regard it would certainly require some stretching to view the discrete offenses committed by Zeppieri as "closely related" or as "involving the same harm" in any event. But we need not resolve that question in those terms, because one of his two offenses plainly does not fit the limiting language first quoted in this paragraph. It is of course true as to the tax count that "the offense level is determined largely on the basis of the total amount of loss," as we have discussed earlier. But in an ironic way the very fact that we have sustained Zeppieri's contention that the offense level on the structuring count is only the base offense level of 6, without any increase whatever for the amount of funds involved, means that the offense level on that count is not determined at all by the amount of the loss. So Guideline § 3D1.2(d), Zeppieri's last prospect for grouping, proves unavailable as well.

In sum, Guideline § 3D1.2 provides no refuge for Zeppieri on the basis that the two counts at issue were "closely related" or involved "substantially the same harm." We affirm the district court's conclusion that Zeppieri's offenses are not to be grouped for sentencing purposes.

## Conclusion

For the reasons stated in this opinion, we uphold both the district court's decision not to group Zeppieri's two offenses and the district court's inclusion of non-charged conduct in the tax loss calculation, but we REVERSE the ultimate sentence imposed by the district court and REMAND the case for resentencing, with instructions (1) to recalculate Zeppieri's tax loss in accordance with the current state of this Court's caselaw and (2) to reduce the conspiracy count base offense level to 6.