HEALTHSOUTH CORPORATION,
Petitioner–Appellant,

v.

BOULDER COUNTY BOARD
OF COMMISSIONERS,
Respondent–Appellee,

and

Colorado State Board of Assessment
Appeals, Appellee.

No. 08CA0233.

Colorado Court of Appeals,
Div. V.

March 19, 2009.

N.H. Wright & Associates, LLC, Norman H. Wright, Greenwood Village, Colorado, for Petitioner–Appellant.

H. Lawrence Hoyt, County Attorney, Michael A. Koertje, Assistant County Attorney, Boulder, Colorado, for Respondent–Appellee.

John W. Suthers, Attorney General, Roxane D. Baca, Senior Assistant Attorney General, Lisa R. Brenner Freimann, Assistant Attorney General, Denver, Colorado, for Appellee.

Opinion by Judge GRAHAM.

In this property tax case, petitioner, HealthSouth Corporation (taxpayer), appeals from a final order of the Board of Assessment Appeals (BAA). The BAA dismissed taxpayer's consolidated administrative appeals challenging the denial by respondent, the Boulder County Board of County Commissioners (BOCC), of two petitions seeking an abatement and refund of a portion of taxpayer's personal property taxes for the 2002 tax year. We reverse the BAA's order and remand for further proceedings on the merits of taxpayer's abatement and refund claims.

The statutory grounds for an abatement and refund of all or part of property taxes levied are provided in section 39–10–114(1)(a)(I)(A), C.R.S.2008, which authorizes an abatement and refund of property taxes levied "erroneously or illegally," whether due to (1) "erroneous valuation for assessment"; (2) "irregularity in levying"; (3) "clerical error"; or (4) "overvaluation."

At issue in this appeal is whether, under the Colorado property tax scheme, a taxpayer may seek an abatement and refund of overpaid personal property taxes when the overpayment resulted from the taxpayer's earlier misconduct in overreporting assets and valuations in filing its personal property declaration schedules. Contrary to the BAA's ruling, we conclude that, under the statutory scheme, taxpayer has the right to proceed with its abatement and refund claims on the ground of overvaluation, not-

withstanding the fraudulent overstatement of its assets and valuations in its initial tax filings. Consequently, the BAA erred in dismissing taxpayer's appeals without affording an evidentiary hearing, and on remand it must consider the merits of taxpayer's overvaluation claims concerning its personal property for the 2002 tax year.

## I. Factual Background

The facts relevant to the legal issues before us are not in dispute. Taxpayer timely filed two abatement and refund petitions with the BOCC concerning the taxes levied on its personal property for the 2002 tax year. After the BOCC denied these petitions, taxpayer timely appealed these decisions to the BAA. The BAA later consolidated these appeals.

In the BAA proceedings, taxpayer sought to reduce the 2002 tax year valuation of its personal property at its Longmont location from $654,642 to $125,517, and to reduce the 2002 tax year valuation of its personal property at its Boulder location from $471,060 to $60,312. The factual basis for taxpayer's abatement and refund claims is that in 2002, as part of a broader fraudulent scheme to increase the company's stock price, taxpayer included fabricated valuations for fictitious assets in the personal property declaration schedules it filed.

Taxpayer, through its independent accountants, disclosed the existence of this scheme to the BOCC in a letter which enclosed a copy of a complaint which had been filed against taxpayer by the Securities and Exchange Commission. The complaint alleged that taxpayer had inflated its earnings to match projections of certain Wall Street analysts and thereafter balanced its books by matching false earnings with false increases in its tangible assets. According to the complaint, taxpayer "engaged in transactions, practices and a course of business which would have operated as a fraud or deceit upon the purchasers of the securities." Now under different management, taxpayer sought an abatement and refund of the portion of the personal property taxes it overpaid attributable to the reported valuations of the nonexistent assets.

The BOCC moved to dismiss taxpayer's appeals, contending that taxpayer's fraud in its personal property tax filings provided no basis for abatement and refund claims under any of the statutory grounds. The BOCC alternatively argued that even if there were any viable statutory grounds for relief under these circumstances, taxpayer's abatement and refund claims should be barred by certain equitable defenses, including the "unclean hands" doctrine.

After considering this motion, taxpayer's response, the BOCC's reply, briefs by the parties, and oral argument at an evidentiary hearing on the issues, the BAA granted the BOCC's motion and dismissed taxpayer's appeals.

As we read the BAA's order, it did not dismiss for lack of jurisdiction. Rather, the BAA ruled that there were no statutory grounds authorizing an abatement and refund under the circumstances stated by taxpayer. Specifically, the BAA ruled that under these circumstances taxpayer's abatement and refund claims were not based on any erroneous valuation for assessment, any clerical error, or any overvaluation within the meaning of these statutory provisions. This appeal followed.

## II. Legal Analysis

We agree with taxpayer that the BAA erred in dismissing its abatement and refund claims under these circumstances. In our view, taxpayer had a viable basis for its abatement and refund claims under the statutory scheme on the ground of overvaluation, to the extent that taxpayer could prove that its personal property was overvalued by the inclusion of any value attributable to nonexistent assets. We also perceive no basis under the statutory scheme for barring these authorized abatement and refund claims under the equitable defenses asserted by the BOCC.

### A. Jurisdictional Issues

We first address the parties' arguments concerning the BAA's jurisdiction to consider taxpayer's abatement and refund claims. As noted by taxpayer, because the administrative appeals from the BOCC's actions denying taxpayer's petitions were timely filed with the BAA, the BAA had jurisdiction and

a statutory duty to "hear" taxpayer's appeals. *See* §§ 39–2–125(1)(f), 39–10–114.5(1), C.R.S. 2008; *5050 S. Broadway Corp. v. Arapahoe County Bd. of Comm'rs,* 815 P.2d 966, 968–69 (Colo.App.1991).

In such administrative appeals, the BAA is not limited to a review of any previous action taken, but instead is authorized to conduct de novo evidentiary proceedings on the merits of the abatement and refund claims. *See D.C. Burns Realty & Trust v. Jefferson County Bd. of County Comm'rs,* 849 P.2d 900, 903 (Colo.App.1992). Nevertheless, even when the BAA has subject matter jurisdiction to hear such appeals, the substantive limitations on abatement and refund claims found in other statutory provisions remain applicable. *See 5050 S. Broadway Corp.,* 815 P.2d at 968–71 (holding that BAA had jurisdiction to hear the appeal, but affirming BAA's denial of abatement and refund claims as unauthorized under statutory scheme).

Here, the BAA stated that it had "heard" taxpayer's appeals, but it ultimately dismissed them upon ruling that taxpayer's abatement and refund claims did not fall within the substantive grounds for such relief under the statutory scheme. Thus, the BAA's order was not based on any jurisdictional issues, and we perceive no error on any jurisdictional grounds.

### B. Overvaluation Issues

Next, contrary to the BOCC's argument and the BAA's analysis, we agree with taxpayer that it asserted viable abatement and refund claims under the circumstances here based on the statutory provisions authorizing such claims on the ground of "overvaluation."

We review interpretations of statutes by the BAA de novo. Our primary purpose when construing statutes is to effectuate the intent of the General Assembly. To determine intent, we first look to the statutory language, giving words and phrases their commonly accepted meaning. *Boulder Country Club v. Boulder County Bd. of Comm'rs,* 97 P.3d 119, 120 (Colo.App.2003).

The term "overvaluation" is not defined in section 39–10–114(1)(a)(I)(A), but it must be given a broad meaning. *See* ch. 309, sec. 1,

§ 39–10–114(1)(a)(I)(A), 1991 Colo. Sess. Laws 1962 (legislative declaration stating that this ground was added to the statutory scheme "with the intent of extending to any taxpayer the right to petition for an abatement or refund of property taxes levied erroneously or illegally due to an overvaluation," which allows abatement and refund petitions "for essentially all errors in valuation"); *see also Portofino Corp. v. Bd. of Assessment Appeals,* 820 P.2d 1157, 1160 (Colo.App.1991) (noting and applying this legislative declaration).

The determination as to the statutory grounds applicable to a taxpayer's abatement and refund claims is based on the substance of the taxpayer's claims, and the language used in the taxpayer's petition is not controlling. When the taxpayer's abatement and refund claims involve a factual determination concerning the appropriate valuation, they are based on the ground of overvaluation. *See Boulder Country Club,* 97 P.3d at 122–23; *Wyler/Pebble Creek Ranch v. Colo. Bd. of Assessment Appeals,* 883 P.2d 597, 600 (Colo. App.1994); *see also* 2 *Assessors Reference Library* § V, at 5.14 (rev. Sept.2008) (provisions of Property Tax Administrator's reference manuals stating that "overvaluation" under section 39–10–114(1)(a)(I)(A) is defined as "valuation adjustments that require judgment").

Here, taxpayer's abatement and refund claims are factually based on its inclusion of fictitious values of nonexistent assets in the personal property declaration schedules it initially filed. Although the personal property taxes levied were based on the assets and values taxpayer reported, the county had the legal authority to value and tax only the property actually located within the county. *See* §§ 39–1–103(5)(a), 39–1–105, C.R.S.2008. Any nonexistent property reported could not be located within the county and could not have any actual value. Consequently, taxpayer asserts that there has been an overvaluation of its taxable personal property in the aggregate, to the extent that the taxes have been levied on valuation attributable to the nonexistent assets initially reported.

Under these circumstances, absent any applicable exceptions, there is a viable basis for

taxpayer's abatement and refund claims under the statutory scheme on the ground of overvaluation. The amount of the overvaluation involves a factual determination as to the valuation improperly assigned to nonexistent assets as opposed to the valuation properly assigned to actual assets located within the county. *See Boulder Country Club*, 97 P.3d at 122–23; *see also Home Depot USA, Inc. v. Pueblo County Bd. of Comm'rs*, 50 P.3d 916, 918–20 (Colo.App.2002) (affirming BAA's factual determinations as to valuation of taxpayer's personal property from evidentiary proceedings on taxpayer's abatement and refund claims).

There are two possible exceptions to the statutory authorization for abatement and refund claims on the ground of overvaluation, but neither one is applicable here.

■ First, abatement and refund claims on the ground of overvaluation are statutorily prohibited if the valuation for the same tax year was previously challenged under the separate protest and adjustment procedure. *See* § 39–10–114(1)(a)(I)(D), C.R.S.2008; *D.C. Burns Realty & Trust*, 849 P.2d at 902. The parties agreed at the BAA hearing that taxpayer did not previously challenge the 2002 tax year valuation of its personal property under the protest and adjustment procedure, and so this exception is inapplicable.

The other exception applies to situations in which a taxpayer has failed to file any personal property declaration schedule and the county assessor has made a "best information available" (BIA) valuation as authorized under section 39–5–116(1), C.R.S.2008. In *Property Tax Adm'r v. Prod. Geophysical Services, Inc.*, 860 P.2d 514, 516–19 (Colo.1993), the supreme court held that a taxpayer in that situation is barred from challenging the BIA valuation of its personal property under the abatement and refund procedure, based on the provisions of section 39–5–118, C.R.S.2008, which applies only when a taxpayer has failed to file a personal property schedule.

In this case, however, taxpayer filed personal property schedules for the 2002 tax year and no BIA valuations were made. Thus, the exception provided by section 39–5–118 and *Production Geophysical Services* is also inapplicable here.

Consequently, under the statutory scheme, taxpayer may be granted relief on its abatement and refund claims on the ground of overvaluation to the extent that it can establish that it was improperly taxed on valuation relating to nonexistent property.

### C. Equitable Defenses

The BOCC also contends that, even if taxpayer had statutory grounds for its abatement and refund claims, these claims should be barred on equitable grounds by the unclean hands doctrine because they arose from taxpayer's own fraudulent misconduct in overreporting assets and valuation in the personal property schedules it filed. We are not persuaded.

■■ Tax provisions are generally viewed as technical laws that are not subject to equitable principles. *Shell W. E & P, Inc. v. Dolores County Bd. of Comm'rs*, 948 P.2d 1002, 1007 (Colo.1997) (*SWEPI*). Nevertheless, in certain circumstances it may be appropriate to apply certain equitable principles in abatement and refund proceedings under the Colorado property tax scheme. *See id.* at 1010 (holding that application of equitable tolling doctrine was appropriate as to statute of limitations in abatement and refund proceedings under circumstances in that case).

■ In our view, it would not be appropriate to permit the application of the nonstatutory equitable defense of the unclean hands doctrine under the circumstances here, which would have the effect of barring taxpayer's statutorily authorized abatement and refund claims, because the General Assembly has addressed this situation but has provided for different consequences.

Nothing in the statutory scheme itself bars a taxpayer that has submitted false information in a filed personal property schedule from later pursuing abatement and refund claims as to any resulting overpayment of its personal property taxes. However, there are two separate statutory provisions otherwise addressing these circumstances. *See* §§ 39–5–116(2), 39–10–114(1)(b), C.R.S.2008.

Under section 39–5–116(2)(a), a taxpayer fails to make a full and complete disclosure of

its personal property for assessment purposes if, among other things, the taxpayer includes in a filed personal property schedule "any information" concerning its property that is "false, erroneous, or misleading." Section 39–5–116(2)(c) further provides that any taxpayer in those circumstances "*shall have the right to pursue* the administrative remedies available to taxpayers *under this title,* dependent upon the basis of [the taxpayer's] claim." (Emphasis added.)

 Thus, the Colorado property tax scheme distinguishes between taxpayers that fail to file any personal property schedules and taxpayers that file personal property schedules that include false information, providing different consequences for each situation. Taxpayers failing to file any personal property schedule are barred from challenging a BIA valuation under the abatement and refund procedure. *Prod. Geophysical Servs.,* 860 P.2d at 516–19; *see* §§ 39–5–116(1), 39–5–118. In contrast, taxpayers filing personal property schedules that include false information have a statutory right to pursue all available administrative remedies, including remedies under the abatement and refund procedure. *See* § 39–5–116(2).

 However, the statutory scheme also provides for more limited adverse consequences to such taxpayers in section 39–10–114(1)(b). Although taxpayers prevailing on abatement and refund claims are generally entitled to refunds of the taxes paid together with refund interest, section 39–10–114(1)(b) provides that refund interest "shall not be paid" if the overpaid taxes were levied "as a result of an error made by the taxpayer in completing personal property schedules." Thus, the statutory penalty provided in such circumstances is limited to the denial of interest on any tax refunds made under the abatement and refund procedure.

The dissent supposes that the phrase, "dependent upon the basis of [the taxpayer's] claim," contained in section 39–5–116(2)(c), provides an exception which allows the BAA to reject a petition for tax abatement in the present circumstance, arguing that the basis for taxpayer's petition here is fraudulent. We read the phrase as referencing the four separate bases for abatement set forth in section 39–10–114: where taxes have been levied erroneously or illegally as the result of (a) erroneous valuation for assessment, (b) irregularity in levying, (c) clerical error, or (d) overvaluation. These four bases are, in our view, different from the nature of a claim, and the statutory provisions do not exclude claims that are in the nature of taxpayer's but nevertheless satisfy one of the four statutory bases. We also note that while the dissent focuses on the fraudulent activity of taxpayer, it was not the BOCC that was the target of the inflated earnings fraud: it was the investors.

In short, although the Colorado statutory scheme does not expressly address the applicability of equitable defenses to abatement and refund claims under these circumstances, it is not silent on the issue. Because the General Assembly has addressed the situation of taxpayers including false or misleading information in filed personal property schedules but has chosen not to bar such taxpayers from later pursuing abatement and refund claims concerning any resulting overpayment of taxes, we perceive no basis for nevertheless effectively barring such claims on nonstatutory grounds by permitting the application of the equitable defense of the unclean hands doctrine in this situation. *See* §§ 39–5–116(2), 39–10–114(1)(b).

## D. Remand Proceedings

For the foregoing reasons, the case must be remanded to the BAA for a new determination on the merits of taxpayer's abatement and refund claims on the ground of overvaluation concerning the 2002 tax year. For such purposes, the BAA is authorized to conduct a de novo evidentiary hearing on taxpayer's claims. Taxpayer is entitled to an abatement and refund of its 2002 personal property taxes, without refund interest, to the extent that it can prove that it was improperly taxed on valuation attributable to nonexistent property rather than valuation attributable to actual assets located within the county on the January 1 assessment date. *See* §§ 39–1–103(5)(a), 39–1–105, 39–10–114(1)(a)(I)(A), (b); *D.C. Burns Realty & Trust,* 849 P.2d at 903–04; *see also Home Depot USA, Inc.,* 50 P.3d at 918–20.

### E. Other Issues

The parties have also asserted arguments based on the rulings on similar claims in cases from other states. *See, e.g., Ex parte HealthSouth Corp.*, 978 So.2d 745 (Ala.2007). However, because those cases were decided based on significantly different statutory language in different statutory schemes in those states, we do not find them to be persuasive in this case regarding the construction of the applicable statutory provisions of the Colorado property tax scheme.

Finally, in view of this disposition of the issues, we need not address the remaining contentions of the parties.

Accordingly, the BAA's order is reversed, and the case is remanded to it for further proceedings consistent with the views expressed in this opinion.

Judge BOORAS concurs.

Judge BERNARD dissents.

Judge BERNARD dissenting.

There is no suggestion in this case that Boulder County did anything wrong in collecting personal property taxes from Health-South. Rather, the payment of personal property taxes at issue here was based on HealthSouth's intentional misrepresentations in documents that it submitted to the County. The County did not invent fictitious personal property; HealthSouth did. The County did not give this fictitious personal property a value; HealthSouth did. As a result, I would conclude that HealthSouth is not entitled to pursue the administrative remedy of abatement and refund of its taxes because it bases its claim for relief on its own misconduct. Therefore, because I would affirm the Board of Assessment Appeals' order, I respectfully dissent.

### I. Background

The record in this case contains a letter written to the Boulder County Treasurer by an accountant seeking the tax abatement and refund for HealthSouth. The letter asked the Treasurer to note that

> as part of a fraudulent scheme [Health-South] inflated income with matching entries to property, plant, and equipment accounts.... [B]eginning with the 1999 tax year, business personal property tax renditions began to include fictitious assets.

To explain the nature of the fraud, the letter referred to the copy of an attached civil complaint that had been filed against HealthSouth by the Securities and Exchange Commission in Alabama. The complaint stated:

> Since 1999, HealthSouth, one of the nation's largest healthcare providers, has overstated its earnings by at least $1.4 billion. This massive overstatement occurred because [HealthSouth's founder] insisted that [HealthSouth] meet or exceed earnings expectations established by Wall Street analysts. When [HealthSouth's] earnings fell short of such estimates, [the founder] directed [HealthSouth's] accounting personnel to "fix it" by artificially inflating the company's earnings to match Wall Street expectations. To balance [HealthSouth's] books, the false increases in earnings were matched by false increases in [HealthSouth's] assets. By the third quarter of 2002, [HealthSouth's] assets were overstated by at least $800 million, or approximately 10 percent of total assets.

The complaint later indicated that the purpose of matching the expectations of Wall Street's analysts was to "maintain the market price for [HealthSouth's] stock." One of the means of inflating asset value was to "record[ ] false entries to the fixed asset books of [HealthSouth's] numerous facilities. The combined amount of the false entries equaled the total amount of fictitious increases to the income statement for that quarter."

This cynical, fraudulent scheme is apparently not unique.

> Since the implosion of Enron in November of 2001, Wall Street has been severely shaken by an unprecedented string of accounting fraud scandals involving publicly traded corporations. Most of the corporations involved have been guilty of earnings inflation—adding fictitious income to their financial statements. The appeal of earnings inflation is obvious. By means of various accounting gimmicks, or by simply manufacturing transactions that never took place, a company can create a steadily

rising earnings curve that will boost its share price. Not surprisingly, this produces lucrative rewards for management. Stock option grants to management frequently are tied to specified earnings targets that may be achieved more quickly by manipulating the company's books. Moreover, as share prices rise based on increases in revenue and profit, management may realize ever-greater gains from sales of previously acquired shares of the company . . . .

Although they are not compelled to do so, corporations that inflate their earnings often pay tax on the fictitious income they create because doing so helps to hide the accounting fraud from investors, analysts and the SEC. If the fraud goes undetected, an offending corporation almost certainly will be content to allow the government to keep the tax overpayments. When the fraud is exposed, however, the corporation is likely to respond by seeking a refund of the overpaid taxes, which may amount to tens or even hundreds of millions of dollars

Craig M. Boise, *Playing with "Monopoly Money": Phony Profits, Fraud Penalties and Equity,* 90 Minn. L.Rev. 144, 146–47 (Nov.2005) (footnotes omitted).

## II. Analysis

### A. Introduction

In my view, (1) HealthSouth's claim is barred by its own misconduct; and (2) section 39–5–116(2)(c), C.R.S.2008, allows such misconduct to be taken into consideration when determining whether a taxpayer is entitled to pursue the statutory right to tax abatement and refund. Section 39–5–116(2)(a), C.R.S.2008, sets out a general rule:

A person fails to make a full and complete disclosure of his personal property pursuant to this paragraph (a) if he includes in a filed schedule any information concerning his property which is false, erroneous, or misleading or fails to include in a schedule any taxable property owned by him.

The legislature further indicates what the effect of violating the general rule is:

Any person subject to paragraph (a) of this subsection (2) shall have the right to pursue the administrative remedies available to taxpayers under this title, *dependent upon the basis of his claim.*

§ 39–5–116(2)(c) (emphasis supplied).

In my view, the language of section 39–5–116(2)(c) clearly states that making false, erroneous, or misleading statements does not *necessarily* bar the pursuit of administrative remedies, such as tax abatement and refund. However, the statute also makes clear that making such statements *may* prevent a taxpayer from pursuing such administrative remedies based upon the nature of the claim.

### B. History

#### 1. Statutory History

In the absence of a statute, voluntarily paid taxes are normally not recoverable by the taxpayer, even if those taxes were collected illegally. *See generally,* David J. Marchitelli, Annotation, *Voluntary Payment Doctrine as Bar to Recovery of Payment of Generally Unlawful Tax,* 1 A.L.R. 6th 229 (2005); 16 Eugene McQuillin, *The Law of Municipal Corporations* § 44.180 (3d ed.2003). The rationale for this concept, called the voluntary payment doctrine or the voluntary payment rule, was explained by the Texas Supreme Court:

This voluntary payment rule may seem counterintuitive, but there are important reasons supporting it. In the taxation context, the rule secures taxing authorities in the orderly conduct of their financial affairs. The [United States] Supreme Court has also recognized the "government's exceedingly strong interest in financial stability in this context" and threats to a state's financial security that can arise from unpredictable revenue shortfalls. The rule also supports the age-old policies of discouraging litigation with the government.

*Dallas County Community College Dist. v. Bolton,* 185 S.W.3d 868, 876–77 (Tex.2005) (quoting *McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco,* 496 U.S. 18, 37, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990)) (citations omitted).

In Colorado, a taxpayer's statutory ability to seek an abatement and refund of taxes has been in effect since 1902. *Board of Assessment Appeals v. Benbrook,* 735 P.2d 860, 863

(Colo.1987). Therefore, because Colorado has a statutory structure that allows for abatement and refund of taxes, the voluntary payment doctrine does not apply to this case.

However, the rationale for the voluntary payment doctrine still plays a role in the functioning of our tax abatement and refund statutes.

> To accommodate the dual needs in Colorado for a reliable constant source of revenue for the government and a remedy for taxpayers who sought to enjoin tax collections in the courts because they believed they were carrying a disproportionate share of the tax burden, Colorado established a statutory remedy that recognized some injunctive actions in equity under the "traditional equity head of fraud" but required a taxpayer to exhaust administrative remedies before going to court if an assessment is deemed excessive.

*Id.* (quoting Ela, *Some Aspects of Colorado Taxpayers' Remedies,* 23 Rocky Mtn. L.Rev. 145, 160 (1950)).

The legislature has, over time, granted taxpayers more leeway when seeking an abatement and refund for taxes they paid because of their mistakes. *See Portofino Corp. v. Board of Assessment Appeals,* 820 P.2d 1157, 1160 (Colo.App.1991)("[W]e conclude that, in amending [section 39–10–114, C.R.S 2008] in 1988, the General Assembly intended to provide taxpayers the opportunity to utilize the abatement and refund provisions for the purpose of challenging an overvaluation.").

Evidence of this legislative trend is found in the evolution of section 39–5–116(2). As pertinent here, the General Assembly first adopted the language referring to "false, erroneous, or misleading" information that now appears in section 39–5–116(2)(a) in 1964. Ch. 94, § 137–5–16, 1964 Colo. Sess. Laws 702. Subsection (2)(c) was added in 1987. Ch. 296, sec. 1, § 39–5–116(2)(c), 1987 Colo. Sess. Laws 1415.

However, at present, this legislative trend culminates with the version of section 39–5–116(2)(c) that has been in effect since 1987. Because the statutory right to an administrative remedy is qualified by the phrase "dependent upon the basis of [the] claim," the legislature has not reached the point of stating that a taxpayer is entitled to pursue administrative remedies seeking a tax abatement and refund in all circumstances in which the taxpayer has provided false, erroneous, or misleading information.

### 2. Colorado Case Law History

The supreme court has looked at the abatement and refund statutory structure several times when considering the effect of mistakes by taxpayers in valuing personal property. In *Boyer Bros. v. Board of Commissioners,* 87 Colo. 275, 288 P. 408 (1930), Wyoming sheepherders had entered into an agreement with a Colorado assessor to pay taxes on sheep grazing in Colorado. The assessment rate was higher than that provided by statute, and the sheepherders sought to recover the difference between the agreed-upon rate and the statutory rate. The supreme court rejected their argument, observing that

> [h]aving been, in part at least, responsible for the assessment in the manner described, and having failed to file a schedule required by law, [the sheepherders are] in no position to urge, as a ground for recovering the taxes paid by [them], the method of assessment followed in this case.

*Id.* at 285, 288 P. at 413.

In *E.A. Stephens & Co. v. Board of Equalization,* 104 Colo. 556, 92 P.2d 732 (1939), a company sought an abatement and refund of overpaid personal property taxes, arguing that, because of a bookkeeper's mistake, it had given the taxing authority erroneous values of the property. Our supreme court concluded that the company was not entitled to the relief it requested because

> it appears that [the company] voluntarily paid the taxes in question; that the error involved was due solely to calculations contained in [the company's] own tax schedule; that the schedule was voluntarily made by it; that the error was due solely to [the company's] own negligence and not to any action of the taxing agencies; that the facts which show the mistake were in the sole possession of [the company].

*Id.* at 559, 92 P.2d at 733.

The supreme court then pointed out that there was a public policy reason for denying

an abatement and refund that echoes the rationale for the voluntary payment doctrine:

> To permit recovery under the facts and circumstances in the instant case would endanger the entire tax structure of the state and lead to a multiplicity of suits for refund of taxes.

*Id.* at 561, 92 P.2d at 734; *see also Coquina Oil Corp. v. Larimer County Bd. of Equalization,* 770 P.2d 1196, 1201 (Colo.1989) ("Taxpayers who create the overvaluation by supplying erroneous information to the taxing authority must discover the mistake and protest within the time prescribed in section 39–5–122 [C.R.S.2008]."), *superseded by statute,* § 39–10–114(1)(a)(I)(A), C.R.S.2008, *as stated in Portofino Corp.,* 820 P.2d at 1159–60.

As recently as 1993, the supreme court recognized the importance of "strict enforcement of statutory duties imposed on taxpayers." *Property Tax Administrator v. Production Geophysical Services, Inc.,* 860 P.2d 514, 519 (Colo.1993).

### C. Harm

I do not cite these Colorado cases because they represent the present status of section 39–5–116(2)(c). Clearly, the legislature has modified the terrain, most recently in 1987, to allow taxpayers to pursue administrative remedies even in some cases when an overpayment may be due entirely to their own conduct.

Rather, I cite these cases because they demonstrate that our supreme court has observed that, absent an express statutory statement to the contrary, taxpayer conduct can bar a tax abatement and refund, and that providing an abatement and refund of overpaid taxes in certain circumstances can harm the "entire tax structure of the state." This leads me to conclude that such harm is an appropriate factor to consider when determining whether a taxpayer's intentional misrepresentation in valuing personal property can be the basis for an administrative remedy.

HealthSouth contends that the County did not suffer any injury because of its misrepresentations. Rather, this argument goes, the County received tax revenue that it would not have obtained had HealthSouth truthfully reported the value of its personal property.

Thus, the County received a windfall, and was not a victim of HealthSouth's scheme.

I disagree with this line of reasoning under the circumstances of this case for three reasons. First, there is the harm done by removing money from the public treasury. As a justice of the Ohio Supreme Court commented in a recent case involving HealthSouth's similar request for an abatement and refund of personal property tax in that state:

> While the majority laments the loss to the "innocent investor" caused by the corporate fraud, I believe that the government and taxing districts are also primary victims of the fraud. While the taxing districts may have temporarily benefited from the overpayment of taxes by HealthSouth (and therefore presumably adjusted their budgets to reflect such income), those same taxing districts, if a refund is upheld on remand, will now be forced, in these very difficult economic times, to come up with funds to repay those tax benefits received. And what is worse, those funds will go back to a corporation that has admitted to massive fraud.

*HealthSouth Corp. v. Levin,* 121 Ohio St.3d 282, 2009-Ohio-584, 903 N.E.2d 1179, 1188 (2009)(Lundberg Stratton, J., concurring).

Second, because the property tax valuation system relies on truthful self-reporting, filing intentionally false disclosures reduces confidence in the system. If the public perceives that misrepresentations designed to secure personal advantage are common, voluntary compliance may dwindle. *See United States v. Bove,* 155 F.3d 44, 49 (2d Cir.1998)(filing a false income tax return implicates the integrity of the national tax system); Boise, *Playing with "Monopoly Money",* 90 Minn. L.Rev. at 172 n. 120 ("There is substantial economic literature on the effect of taxpayer attitudes on tax compliance, with most researchers concluding that taxpayer perceptions of fairness in the tax system and perceptions of compliance by other taxpayers significantly affect the overall rate of tax compliance.").

Third, misrepresentations like these can adversely affect the County's capacity to do its duty. The ability to determine a taxpayer's true tax liability may be compromised

because, during the period the County relies on the false report, records may be destroyed or falsified. *See Badaracco v. Commissioner*, 464 U.S. 386, 398, 104 S.Ct. 756, 78 L.Ed.2d 549 (1984) (federal criminal income tax case). Subsequent voluntary disclosures may not be trusted, for obvious reasons, thus requiring the County to focus more resources on verification of that taxpayer's submissions. *Id.* at 399, 104 S.Ct. 756.

### D. Other Jurisdictions

This issue concerning this taxpayer has been presented to courts in other states, with differing results. *Compare Ex parte HealthSouth Corp.*, 978 So.2d 745, 748–50 (Ala.2007) (statutory terms "error" and "mistake" did not include intentional dishonesty; taxpayer was not entitled to a refund for taxes paid on fictitious property under equitable principles), *with HealthSouth Corp. v. Levin*, 903 N.E.2d at 1184–85 (Ohio statute mandates refunds unless the reason for refusal appears in the statute; equitable principles did not apply; HealthSouth entitled to refund if it can prove its case). A reading of these cases makes clear that their results depend directly on the language employed in their statutes.

### E. Conclusion

Generally, tax provisions are technical laws not subject to equitable principles. *Shell Western E & P, Inc. v. Dolores County Bd. of Comm'rs*, 948 P.2d 1002, 1007 (Colo.1997). However, there are exceptions, including when, in a tax abatement and refund case, the application of equitable principles is necessary to avoid an unjust result occasioned by strict application of a statute of limitations. *Id.*

It is my view that the General Assembly created an equitable exception to a taxpayer's statutory right to pursue a tax abatement and refund in section 39–5–116(2)(c). The phrase "dependent upon the basis of [the] claim" qualifies the statutory right. I conclude that this phrase authorizes the decision maker, in situations such as these involving "false, erroneous, or misleading" information, to apply equitable principles when examining the reason for providing such information. *See Shell Western E & P*, 948 P.2d at 1010 ("The application of the doctrine of equitable tolling requires an inquiry into the circumstances of the delay that prompted the statute of limitations to be invoked.")

By specifically including the phrase "dependent upon the basis of [the] claim," I believe that section 39–5–116(2)(c) places Colorado squarely in the analytical camp occupied by the majority of the Alabama Supreme Court in *HealthSouth Corp.* Thus, because our legislature has made clear that the nature of the claim for an abatement and refund should determine whether a taxpayer has a right to pursue administrative remedies, I am persuaded by the majority opinion in *HealthSouth Corp.* that we should apply equitable principles in situations such as these.

The majority in *HealthSouth Corp.* reached its decision relying on language from *Stone v. White*, 301 U.S. 532, 535, 57 S.Ct. 851, 81 L.Ed. 1265 (1937):

> The statutes authorizing tax refunds and suits for their recovery are predicated upon the same equitable principles that underlie an action in assumpsit for money had and received. Since, in this type of action, the plaintiff must recover by virtue of a right measured by equitable standards, it follows that it is open to the defendant to show any state of facts which, according to those standards, would deny the right, even without resort to the modern statutory authority for pleading equitable defenses in actions which are more strictly legal.

*Id.* (citations omitted), *quoted in HealthSouth Corp.*, 978 So.2d at 754. I think this language is particularly persuasive because our supreme court indicated that the tax abatement and refund remedy "recognized some actions in equity under the 'traditional equity head of fraud.'" *Board of Assessment Appeals v. Benbrook*, 735 P.2d at 863.

Here, HealthSouth's hands are unclean because its intentionally improper conduct had "an immediate and necessary relation to the claim under which relief is sought." *See Colorado Korean Ass'n v. Korean Senior Ass'n*, 151 P.3d 626, 629 (Colo.App.2006). I would, therefore, deny HealthSouth its statutory right to seek administrative relief because

[t]he guiding doctrine in this case is the equitable maxim that "he who comes into equity must come with clean hands." This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. This presupposes a refusal on its part to be "the abetter of iniquity." Thus while "equity does not demand that its suitors shall have led blameless lives" as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue.

*Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814–15, 65 S.Ct. 993, 89 L.Ed. 1381 (1945) (quoting *Bein v. Heath*, 47 U.S. 228, 247, 6 How. 228, 12 L.Ed. 416 (1848), and *Loughran v. Loughran*, 292 U.S. 216, 229, 54 S.Ct. 684, 78 L.Ed. 1219 (1934)) (citations omitted).

I would conclude differently if the misrepresentations had been a product of innocent mistakes, or even simple negligence. I would also view this case differently if the County had contributed to this situation through its own mistakes, negligence, or misconduct. And, although I recognize that many of HealthSouth's shareholders are also victims of its misconduct who may be entitled to relief of their own in a different proceeding, the interests I have identified above weigh, on my scale, in favor of denying HealthSouth the relief it seeks here.

I would conclude, as did the Alabama Civil Court of Appeals in *HealthSouth Corp. v. Jefferson County Tax Assessor*, 978 So.2d 737, 744 (Ala.Civ.App.2006), the decision affirmed by the Alabama Supreme Court opinion cited above, that:

HealthSouth cannot intentionally provide the tax assessor with misleading information in furtherance of a fraudulent scheme, allow the tax assessor to depend on this information in making the assessment, let the assessment stand while it benefits from the fraudulent scheme, and then change its position and request a refund of the taxes when the fraud is discovered and is no longer profitable.